DONNELLY ASSOCIATES, Limited
Partnership, Petitioner,

v.

DISTRICT OF COLUMBIA HISTORIC
PRESERVATION REVIEW
BOARD, Respondent,

District of Columbia Preservation
League, Intervenor.

No. 84–1594.

District of Columbia Court of Appeals.

Argued Oct. 31, 1985.
Decided Jan. 14, 1987.

Whayne S. Quin, with whom C. Francis Murphy, Louis P. Robbins, and Maureen Ellen Dwyer, Washington, D.C., were on brief, for petitioner.

Richard B. Nettler, Asst. Corp. Counsel, with whom John N. Suda, Acting Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for respondent.

William K. Rawson, with whom James F. Rogers, Washington, D.C., was on brief for intervenor.

Before PRYOR, Chief Judge,
BELSON, Associate Judge, and
BURGESS, Associate Judge, Superior Court of the District of Columbia.[1]

BURGESS, Associate Judge:

In this petition for review, petitioner Donnelly Associates Limited Partnership ("Donnelly" or "Petitioner") challenges a decision of the District of Columbia Historic Preservation Review Board ("the Review Board") to designate properties owned by Donnelly as historic landmarks. We conclude that we lack jurisdiction to determine the issues Donnelly raises and therefore dismiss the petition.

**1.** Sitting by designation pursuant to D.C.Code § 11–707(a) (1981).

**2.** The Joint Committee was an Inter-Governmental Agency under the sponsorship of the Mayor of the District of Columbia and two federal agencies, the National Capital Planning Commission, 40 U.S.C. § 71a, and the Commis-

I.

A.

The District of Columbia enacted the District of Columbia Historic Landmark and Historic District Preservation Act, D.C. Code §§ 5–1001 *et seq.* (1981 and 1985 Supp.) ("The Act") for the "protection, enhancement and perpetuation of properties of historical, cultural and esthetic merit." D.C.Code § 5–1001(a) (1985 Supp.). In enacting our historic preservation statute, the District of Columbia followed the 50 states and more than 500 municipalities that have passed similar statutes for the same purpose. *Citizens Committee To Save Historic Rhodes Tavern v. District of Columbia Department of Housing and Community Development,* 432 A.2d 710, 712 (D.C.), *cert. denied,* 454 U.S. 1054, 102 S.Ct. 599, 70 L.Ed.2d 590 (1981). The Review Board, established in 1983 to succeed the Joint Committee on Landmarks,[2] administers the Act. D.C.Code § 5–1003.

Among its functions, the Review Board decides whether or not to designate property as an historic landmark. Once a property is designated, its owner may not demolish or alter it unless he obtains a permit from the Mayor[3] to do so. The Mayor cannot issue the permit unless he finds, "after a public hearing," that alteration or demolition is "necessary in the public interest" or that failure to grant the requested permit will result in "unreasonable economic hardship" to the owner. D.C.Code §§ 5–1004(c), (e), 5–1005(c), (f). The Mayor must, with limited exceptions, refer all permit applications to the Review Board and make a decision within 120 days after the Board receives that referral. D.C.Code §§ 5–1004(c), 5–1005(c). The public hearing that must precede the Mayor's finding is conducted "in accordance with the provi-

sion on Fine Arts, 40 U.S.C. § 104. *See A & G Limited Partnership v. Joint Committee on Landmarks,* 449 A.2d 291, 292 (D.C.1982).

**3.** When we use "Mayor" we, of course, mean the Mayor or his designated agent. *See* D.C.Code § 5–1002(8).

sions of the D.C. Administrative Procedure Act" ("D.C.A.P.A."), and is appealable to this Court. D.C.Code § 5–1012(b).

If an application has been filed with the Review Board to have property designated as an historic landmark,[4] the owner of the property may not alter or demolish that property pending a decision by the Review Board. The Review Board has ninety days from "receipt" of the demolition or alteration permit to decide whether or not to list the property as an historic landmark. D.C. Code § 5–1002(6)(B). The Act provides that "any property not so listed will not be considered an historic landmark within the terms of this chapter." *Id.*[5]

**B.**

The origin of this petition is a contract executed on October 28, 1983, in which Donnelly agreed to buy properties located at 2521 and 2523 K Street, N.W. from the estate of Emily B. Cooper for $400,000. After demolishing the buildings, he intended to build a high-rise condominium on the site. The contract contained a contingency clause giving Donnelly thirty days to study the economic feasibility of the purchase and to obtain a demolition permit. The parties later extended the study period first to December 15, and then to January 15, 1984.

Meanwhile, on December 9, 1983, the District of Columbia Preservation League ("The League"), filed an application with the Review Board for designation of the two K street properties as historic landmarks. The application was submitted as a result of a survey of the Foggy Bottom area that indicated to the League that the K street properties were the oldest extant homes in that area and represented distinctive examples of "intact vernacular architecture from Washington's early years." The Review Board did not notify the Cooper estate of the application. Donnelly did not learn of the application either.

On December 21, 1983, a demolition contractor hired by Donnelly, but purporting to act on behalf of the Cooper estate, filed an application for a demolition permit with the permit branch of the D.C. Department of Licenses and Inspections ("Department of Licenses"). *See* D.C.Code § 5–426. The permit branch did not know of the League's designation application and began processing the demolition permit. On January 3, 1984, the permit branch received notice of the designation application but did not notify the Cooper estate. After the League filed the application, neither Donnelly nor his agent inquired at the Review Board or the permit branch whether a designation application had been filed.

By January 15, Donnelly had not received a demolition permit. Still unaware of the designation application, and believing the demolition permit was shortly to be issued, he did not seek a further extension of the contingency clause. On January 20, Donnelly's demolition contractor learned about the designation application when he went to the permit branch to pick up the demolition permit and was informed that it could not be issued. Apparently feeling bound by the contract with Cooper, Donnelly closed the transaction sometime in February.

---

**4.** 32 D.C.Reg. 1,986 § 115.5 (1985) provides:
Application for designation of a property as a historic landmark shall be made only by the owner of the property, the Board, a public agency, governmental unit or department or an organization which includes among its purposes the promotion of historic preservation in the District.

**5.** D.C.Code § 5–1002(6)(B) provides in full:
(6) "Historic landmark" means a building, structure, object or feature, and its site, or a site:

(B) Listed in the District of Columbia's inventory of historic sites, or for which application for such listing is pending with the Historic Preservation Review Board: Provided, that the Review Board will determine within 90 days of receipt of an application pursuant to §§ 5–1004, 5–1005, 5–1006, 5–1007 or 5–1008 whether to list such property, and any property not so listed will not be considered an historic landmark within the terms of this chapter.

Notice of the designation application first appeared in the D.C. Register on February 10, 1984. Donnelly did not receive individual notice of that application until March, 1984, when the Review Board, responding to his inquiries, wrote him that the designation application was on file. When informed by the Review Board that it believed the ninety-day period within which it must act on the application would be triggered only upon Donnelly's filing a new application for a demolition permit, he filed one on July 31, 1984.

The Review Board held a hearing on the designation application on October 17, 1984.[6] At that hearing, petitioner's counsel objected to the Review Board's jurisdiction on the ground that the Board had failed to act within the required ninety-day period after the first application had been filed. Counsel also objected to the Board's failure to adopt and duly publish final rules of procedure; its failure to give notice of the designation application before Donnelly completed the purchase; and its refusal to permit cross-examination of witnesses. After hearing extensive testimony on these issues, the Review Board overruled the objections and set a hearing on the merits of the proposed designation for October 24, 1984.

At the October 24 hearing, the Review Board heard testimony on whether the properties possessed historic value. Over Donnelly's objection, it again prohibited cross-examination of witnesses, although it permitted Donnelly to put questions to opposition witnesses through the chairman. After hearing, the Review Board explicitly departed from its normal practice and decided to vote on the issue rather than deferring the case for consideration. It voted to adopt the staff "recommendation" that the properties be designated[7] an historic landmark and announced the vote at the close of the hearing.[8] It thereafter mailed a written decision to Donnelly, which he received on November 12, 1984.[9] He filed a petition for appeal within fifteen days thereafter.

In this petition, Donnelly does not question the Review Board's determination that the properties possess historic value, but renews his jurisdictional and procedural objections. Respondent and intervenor initially pose two objections to our jurisdiction. Since we find one of these objections convincing, we cannot address the merits of Donnelly's petition.

## II.

■ Respondent and intervenor argue first that Donnelly failed to file a petition for review within fifteen days after receiving "formal notice" of the Review Board's

---

**6.** 32 D.C.Reg. 1,987 § 120.1 (1985) provides:
Hearings shall be scheduled by the Board as needed for the purpose of receiving evidence and testimony on applications for historic landmarks and historic districts.

**7.** 32 D.C.Reg. 1,986 § 117.1 (1985) provides:
Each application required by Section 115.1 shall be referred to the staff of the Board for a written report.
The staff recommendation was contained in its report.

**8.** The procedures followed at the hearing, before the vote, are those set out in the notice of emergency and proposed rule-making forwarded to the D.C. Register by the Department of Consumer and Regulatory Affairs on October 17, 1984. These rules are identical to the emergency rules which were adopted by the Review Board on August 22, 1983, and to the formal rules now in effect published at 32 D.C.Reg. 1,979 100 *et seq.* (April 12, 1985). The procedure to be followed at a designation hearing, set out in § 121.1, provides for introductory statements by the chairperson; statements by the applicant; a reading of the staff report; reports or statements by public agencies; testimony of affected Advisory Neighborhood Commissions; testimony of parties and persons in support of the application; testimony of parties and persons in opposition to the application; and rebuttal by the applicant.

**9.** 32 D.C.Reg. 1,989, § 123.1 (1985) provides:
The Board shall issue a written decision with respect to the proposed designation, with reasons therefor, and shall mail a copy of the decision to each party.
§ 123.4 provides:
The decision shall become final when copies are mailed to the parties.

order as required by D.C.App.R. 15(b).[10] They pinpoint October 24, 1984, the day the Review Board orally announced its vote to designate the properties, as the day Donnelly received "formal" notice. Petitioner, on the other hand, argues that he only received "formal" notice on November 12, 1984, the day he received the Review Board's written decision.

The parties have not cited and we have not found any decision dispositive of this issue. *Glenwood Cemetery v. District of Columbia Zoning Commission*, 448 A.2d 241 (D.C.1982), cited by both sides, is not determinative. It held that receipt of notice of final decision by registered mail was receipt of "formal notice," even though the agency's rules provided that the decision would not be "final and effective" until the ministerial act of publication in the D.C. Register. *Id.* at 242. *Glenwood* did not address the question we face of whether an agency decision rendered orally in the presence of the parties constitutes "formal notice." Nor is *Valentine v. Real Estate Commission*, 163 A.2d 554 (D.C.1960), controlling. Petitioner in that case was untimely because she filed a petition sixteen days from having received "formal notice" of a decision after a public hearing. The Court, however, never identified what that "formal notice" consisted of and whether or not it occurred at the public hearing.

In the absence of any controlling precedent or any definition of "formal notice" in our own rule, we turn to the dictionary definition of "formal." The dictionary provides the following pertinent definition of the word:

> 2a. following or according with established form, custom, or rule: not deviating from what is usual or generally acceptable: conventional ... b. done in due form: carried out with solemnity: cere-

monial ... 3a. based on forms and rules, espe[cially] such as are accepted by convention: of or following a prescribed form ... c. *of a legal procedure:* requiring special or stipulated solemnities or formalities to become effective.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 893 (1971).

With these definitions in mind, we look to the Review Board's own rules and procedures to find out what was the established and usual way of providing notice. The rules applicable at the time of the Review Board's decision, as now, provided that the Board "shall issue a written decision ... with reasons therefor, and shall mail a copy of the decision to each party." § 123.1. They further provided that the decision would become final "when copies are mailed to the parties," § 123.4, and that the "[b]oard may reopen the record at any time prior to the issuance of a final decision." The rules nowhere mentioned oral decisions or oral notice. Thus, the established, generally acceptable method of issuing a final decision and providing notice of it was by mailing a written decision to the parties. We therefore think that to preserve the meaning of "formal" we should construe it in this case to mean written notice of a written decision.

Additional considerations support our interpretation. Unlike the rules governing criminal and civil cases, the Review Board's rules, aside from requiring a written decision, make no provision for written recordation of a decision. *Compare* Super.Ct. Civ.R. 58, 79(a), Super.Ct.Crim.R. 55. Appeal time from orders in civil and criminal cases runs from "entry" of the order, D.C. App.R. 4(a)(1) and (b)(1). Thus, even where a trial court renders an oral decision, the parties are provided both a fixed point

---

**10.** At the time this petition was filed, Rule 15(b) provided, in pertinent part, that a party must file a petition within fifteen days "from the date of having been given formal notice of the order or decision sought to be reviewed, unless an applicable statute provides a different time for filing said petition." That rule was revised in January, 1984, and the present D.C.App.R. 15(a) provides that a petition for review must be filed within thirty days after "notice is given, in conformance with the rules and regulations of the agency," and that "[i]f the order or decision is made out of the presence of the parties and notice thereof is by mail, the petitioner shall have five additional days from the date of mailing."

from which the appeal time runs and a written recordation embodying the substance of the order to be appealed. Respondent and intervenor's interpretations of "formal notice" provide neither of these virtues. The starting point is not fixed; it differs depending on whether the agency chooses to render an oral or a written decision. If the decision is oral, there is no written recordation of its substance, and the losing party may be uncertain whether the result and the reasons for it will be the same when the written decision comes down. We should, if possible, minimize guesses by the parties on which decision is the proper one to be appealed. *See ITT World Communications, Inc. v. FCC*, 621 F.2d 1201, 1206 (2d Cir.1980) (opinion of Newman, J.). These reasons support our view that, at least where the agency's own rules provide only for a written decision and for no other regular means of reducing the substance of a decision to writing and giving notice to the parties "formal notice" should be construed to mean written notice embodying the decision sought to be reviewed.[11]

Finally, in determining when petitioner received "formal notice of the order or decision to be reviewed," we think it important to focus on what occurred before the Review Board. In the course of the October 24 hearing, petitioner's counsel inquired several times under what rules the Review Board purported to act, and was told repeatedly that the Review Board was proceeding under emergency rules adopted earlier. Notwithstanding these assurances, the Review Board decided to depart from its normal practice, vote then and there, and orally inform the parties of its decision adopting the staff "recommendation." That "recommendation" was includ-

ed in a two and one-half page staff "report." The report described the properties and gave reasons for the staff recommendation that the properties be designated an historic landmark and that they be recommended for nomination to the National Register of Historic Places. The Board then informed the parties of the vote. However, the Board did not orally state its reasons for its decision nor "describe [the] general characteristics [and] specify [the] boundaries" of the properties, elements required in every decision of the Review Board by § 132.2 of its rules.

Respondent and intervenor argue that the Review Board's vote was its final decision. Arguably this view is correct, if for no other reason than that the Review Board obviously felt compelled to act immediately because the statutory period for making a designation was shortly to expire. *See supra* note 5. Nevertheless, the vote to adopt the staff "recommendation" did not explicitly contain all the elements necessary for a final decision. Mindful of the Review Board's several reiterations that it was operating under its emergency rules, which provided that only a written decision would be final, we think that the announcement of the oral vote is ambiguous evidence of the intent to utter a final decision. The ambiguity was resolved when the Review Board decided thereafter to issue a written decision satisfying all the elements of a final decision. We take this formal written decision "as in fact and in law" the pronouncement of its decision, receipt of which began the fifteen-day period for filing the petition. *See United States v. Hark*, 320 U.S. 531, 534–35, 64 S.Ct. 359, 360–61, 88 L.Ed. 290 (1944).

11. In *Koons v. Placer Hills Union School District*, 61 Cal.App.3d 484, 132 Cal.Rptr. 243 (1976), the court was confronted with a similar situation. The agency issued an oral decision, "effective immediately," and later issued a written decision. The court held that the appeal period ran from the delivery of the written decision. Although there the controlling statute governing timeliness of appeals differed from the language

here, at least one policy consideration mentioned in support of the result in *Koons* applies equally here. Starting the appeal period from delivery of the written decision "fosters intelligent, considered decisions and avoids the necessity for rash, uninformed and wasteful judgments on whether judicial review should be sought." 132 Cal.Rptr. at 247.

**276**

### III.

We have jurisdiction under D.C.Code § 11–722 (1981) to review orders and decisions of any District of Columbia agency "in accordance with the District of Columbia Administrative Procedure Act." That act limits our jurisdiction to "contested case[s]," D.C.Code § 1–1510(a). In *A & G Limited Partnership v. Joint Committee on Landmarks of the National Capitol, supra,* 449 A.2d at 293, we held that the Joint Committee on Landmarks of the National Capitol was not an "agency of the District of Columbia" within the meaning of § 11–722 and therefore that we had no jurisdiction to review its orders. In that case, we implied that we would have jurisdiction to review orders from an Historic Designation Review Board appointed by the Mayor. *Id.* Since we had no need then, however, to examine whether proceedings before such an agency met the "contested case" requirements of D.C.Code § 1–1510(a), that decision does not control our disposition of the issue. This is the first occasion in which we are presented with the question of whether the proceedings before the Review Board meet the contested case requirement of D.C.Code § 1–1510(a).

> The statute defines a contested case as a proceeding before the Mayor or any agency in which the legal rights, duties, or privileges of specific parties are required by law (other than this subchapter), or by constitutional right, to be determined after a hearing before the Mayor or before an agency....

D.C.Code § 1502(8). In *Chevy Chase Citizens Association v. District of Columbia Council,* 327 A.2d 310, 314 (D.C.1974) (*en banc*), we held that the phrase "after a hearing" in § 1–1510(a) means "after a trial type hearing where such is implicitly required by either the organic act or constitutional right." Thus, to establish jurisdiction in this Court, a petitioner must overcome two obstacles:

the first obstacle ... is that an administrative hearing must be either statutorily or constitutionally compelled; the second, that such a hearing must be adjudicatory as opposed to legislative in nature.

*W.C. & A.N. Miller Development Company v. District of Columbia Zoning Commission,* 340 A.2d 420, 422 (D.C.1975) (*en banc*). In our view Donnelly has failed to overcome the first obstacle.

### A.

■ Turning first to the language of the Act, we find that the relevant provision states that "the Review Board will determine within 90 days of a receipt of an application ... whether to list such property [as an historic landmark]...." D.C. Code § 5–1002(6)(B). This provision requires no hearing before a property is listed. In contrast, in several other places within the Act the City Council specified when a hearing was required. The Mayor is expressly required to hold a "public hearing" prior to permitting demolition of an historic landmark. D.C.Code § 5–1004(c). The Mayor must hold a "public hearing" prior to permitting alteration of an historic landmark on grounds of economic hardship or special merit, and "in any other case he deems appropriate or in which the applicant so requests." D.C.Code § 5–1005(e). Before permitting subdivision of an historic landmark or of a property in an historic district, the Mayor must hold a "public hearing" unless the Review Board, in the case of a subdivision of a lot in an historic district, advises that a subdivision is consistent with the purposes of this chapter. D.C.Code § 5–1005(c). These and other instances in which a public hearing is required [12] show that the omission of a hearing requirement prior to an historic landmark designation was conscious, not inadvertent.

The Report accompanying the legislation is likewise explicit about the City Council's

12. D.C.Code §§ 1002(5)(C), 5–1007(e).

intent. Explaining D.C.Code § 5–1012(b),[13] the Report states:

> Hearings held pursuant to the act are to be treated as a contested case by the Mayor and for purposes of the D.C. Administrative Procedures Act....

Legislative Council of the District of Columbia, Committee on Housing and Urban Development, Section by Section Analysis of Bill 2–367 at 14 (1978). This statement reveals a clear intent that "the Mayor" shall treat a hearing held "pursuant to the act" as a contested case. Designation proceedings before the Review Board are not, however, "held pursuant to the act" and, in any event, are not hearings before the Mayor. Accordingly, the legislative history reinforces our conclusion that the statute neither explicitly nor implicitly requires a hearing before a property is listed as an historic landmark.

Petitioner urges us to derive a legislative intent from D.C.Code § 5–1003(c)(3), which provides that the Review Board shall

> [d]esignate and maintain a current inventory of historic landmarks and historic districts in the District of Columbia and, in connection therewith, adopt and publish appropriate procedures....

Donnelly argues that "appropriate procedures" necessarily must include provisions for hearings given the nature of the property rights involved in a landmark designation proceeding. In view of the absence of any statutory provision for a hearing in connection with designation, we decline to convert what plainly is a grant of discretionary authority into an implied requirement that a particular procedure be adopted.

Nor are we willing to infer a legislative intent to require a hearing from the Review Board's regulations providing for one "as needed." 32 D.C.Reg. 1,987 § 120.1. An agency might well in its discretion, or to comply with the Constitution, decide to

require some kind of hearing. That decision cannot, without other evidence of legislative intent, be used to fill in a conspicuous omission in the statute. Because a "contested case" is a trial-type hearing where such is implicitly required by either the organic act or by constitutional right, we think that the D.C.A.P.A., like the federal Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (1982), exempts from the contested case requirement "hearings" which administrative agencies may hold "by regulation, rule, custom, or special dispensation." *Wong Yang Sung v. McGrath,* 339 U.S. 33, 50, 70 S.Ct. 445, 454, 94 L.Ed. 616 (1950); *Taylor v. District Engineer, U.S. Army Corps of Engineers, Jacksonville, Fla.,* 567 F.2d 1332, 1336, 1338 (5th Cir.1978). Of course, if the regulations required a trial-type hearing, the contested case proceeding would be required "by law" and we would treat it as such. *Palisades Citizens Association, Inc. v. District of Columbia Zoning Commission,* 368 A.2d 1143, 1147 (D.C.1977).

The absence of a statutorily imposed hearing requirement is crucial to our determination that, in the absence of a constitutional requirement, historic landmark designation proceedings are not contested cases. Petitioner argues forcefully that dispositive of the issue is "whether the proceeding involved particular facts and information affecting the interests of specific parties to the proceeding." He contends that our cases have established that proceedings of this nature are contested cases and therefore subject to review in this Court. We disagree with Donnelly's analysis.

It is true that the nature of a proceeding may sometimes be determinative of whether it meets contested case requirements. Where a statute has required some kind of hearing, we have gone on to determine whether or not the proceeding involved was

---

**13.** This subsection provides:

> All proceedings pursuant to this chapter shall be conducted in accordance with the applicable provisions of the Administrative Procedure Act (D.C.Code § 1–1501 *et seq.*). Any final order of the Mayor under this chapter shall be reviewable in the District of Columbia Court of Appeals.

adjudicatory or legislative in nature; that is, whether the administrative body was perform[ing] an adjudicative function, weighing particular information and arriving at a decision directed at the rights of specific individuals, or sit[ting] in a legislative capacity, making a policy decision directed toward the general public. *Chevy Chase, supra,* 327 A.2d at 315 (quoting *Citizens Association of Georgetown, Inc. v. Washington,* 291 A.2d 699, 704 (D.C.1972)). This distinction, which we have further refined into a question of whether the proceeding at issue involved adjudicative or legislative facts, *id.* at 314, has been considered determinative in several of our holdings. *See, e.g., Schneider v. District of Columbia Zoning Commission,* 383 A.2d 324, 328–29 (D.C.1978); *Dupont Circle Citizen's Association v. District of Columbia Zoning Commission,* 343 A.2d 296, 300–01 (D.C.1975) (*en banc*); *Chevy Chase, supra,* 327 A.2d at 316; *Capitol Hill Restoration Society v. Zoning Commission,* 287 A.2d 101, 105–06 (D.C.1972). We have never held, however, that where we can find no explicit or implicit statutory requirement of any hearing at all, a proceeding will be considered a contested case nevertheless, simply because it is adjudicatory in nature.[14]

Our understanding of the D.C.A.P.A., as interpreted by our prior cases, is confirmed by the decisions of federal courts interpreting the analogous provision of the federal A.P.A., 5 U.S.C. § 554(a) (1982), which requires a trial-type hearing "in every case of adjudication required by statute to be determined on the record after opportunity for any agency hearing...." In applying that provision to adjudications, courts have held that, where Congress has not required a hearing "on the record," they will look to the "substantive nature of the hearing Con-

gress intended to provide." *Seacoast Anti-Pollution League v. Costle,* 572 F.2d 872, 876 (1st Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978); *see also Marathon Oil Co. v. Environmental Protection Agency,* 564 F.2d 1253, 1264 (9th Cir.1977). In such an analysis, the nature of the issues to be determined will be determinative in ascertaining what Congress intended when it provided for a hearing. *Yong v. Regional Manpower Administrator, United States Department of Labor,* 509 F.2d 243, 246 (9th Cir.1975). But the court is at all times bound by "the crucial part of the limiting language ...[,] the requirement of a statutorily imposed hearing." *Seacoast, supra,* 572 F.2d at 877. Thus, where the statute provides for no hearing at all, the requirement of a full trial-type hearing will not be imposed. *Colorado v. Veterans Administration,* 602 F.2d 926, 928 (10th Cir.1979); *Taylor, supra,* 567 F.2d at 1336; *Sisselman v. Smith,* 432 F.2d 750, 754 (3rd Cir.1970).

▮ This is not to say that where the legislature provides no hearing at all, the statute never can be interpreted to require a full trial-type hearing of adjudicative facts. *Wong Yang Sung v. McGrath, supra,* 339 U.S. at 49, 70 S.Ct. at 453, makes clear that, despite no statutory mention of a hearing, a requirement of a trial-type hearing will be read into the statute "to save the statute from [constitutional] invalidity." Since we separately analyze the question whether the Constitution requires a trial-type hearing, we have no occasion at this point to discuss that issue. We merely conclude that, where we are unable to find in the language, structure, or history of a statute a legislative intent to impose a requirement of any kind of hearing, the fact that the proceeding may involve primarily adjudicative fact will not make it a contest-

---

14. In *W.C. & A.N. Miller Development Company, supra,* in which the statute involved required no hearing, the petitioner argued that a mere consideration of a written application to propose an amendment and a subsequent rejection was a "hearing." We responded by pointing out that the decision was legislative in nature. 340 A.2d

at 423–24. We do not construe this approach as constituting an implied holding that, had the proceeding been adjudicative in nature, it would have been a contested case. Rather we view this aspect of the decision as merely assuming, for purposes of argument, that the "hearing" requirement had been met.

ed case. *See Bryant v. Barry*, 456 A.2d 1252, 1253–54 (D.C.1983); *Richardson v. District of Columbia Redevelopment Land Agency*, 453 A.2d 118, 126 (D.C.1982) (Newman, C.J., dissenting on other grounds).

**B.**

We next examine whether petitioner was entitled to a full trial-type hearing under the due process clause of the fifth amendment, which provides that "no person shall ... be deprived of life, liberty or property without due process of law." U.S. Const. amend. V. Respondent is willing to assume for purposes of argument that Donnelly had a protected property interest. Therefore, without deciding that issue, we proceed to determine what process was due him.

The Supreme Court has stressed that "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), provides us with a three-pronged balancing test for analyzing what protections are required. We must first

> examine the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* The burden is on petitioner to persuade us to depart from "the ordinary principle, established by [Supreme Court] decisions, that something less than a [trial-type] hearing is sufficient prior to adverse administrative action." *See id.*, 424 U.S. at 343, 96 S.Ct. at 906.

**(1)** *The Private Interest.*

"[T]he extent to which ... [a person] may be 'condemned to suffer grievous loss' " is in part determinative of what process is due him. *Goldberg v. Kelly*, 397 U.S. 254, 262–63, 90 S.Ct. 1011, 1017–18, 25 L.Ed.2d 287 (1970) (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)). In considering the nature of the loss, we are required to evaluate both the "importance of the private interest and the finality of the deprivation." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434, 102 S.Ct. 1148, 1156, 71 L.Ed.2d 265 (1982). In the case of an historic designation, these factors are, at least in part, interrelated.

**(a)** *Temporary Deprivation.*

A designation imposes a prohibition on demolition and alteration that may be only temporary. An owner of designated property may still obtain a permit to demolish or alter his property if he can show the Mayor that issuance of a permit "is necessary in the public interest." D.C.Code §§ 5–1004(e) and 5–1005(f). Under § 5–1002(10),

> "necessary in the public interest" means consistent with the purposes of this chapter as set forth in § 5001(b) or necessary to allow the construction of a project of special merit.

The Mayor might approve a proposal for alteration that would be consistent with the purpose of the Act to "retain and enhance historic landmarks ... and to encourage their adaptation for current use." D.C. Code § 5–1001(b)(2)(A). Alternatively, an owner might be able to show the Mayor that a project to replace the landmark would have special merit because it would

> hav[e] significant benefits to the District of Columbia or to the community by virtue of exemplary architecture, specific features of land planning, or social or other benefits having a high priority for community services.

D.C.Code § 5–1002(11). In *Citizens Committee to Save Historic Rhodes Tavern, supra,* 432 A.2d at 716, we held that in determining whether a proposed demolition or alteration has special merit, the Mayor's Agent must "balance the historical value of the particular landmark against the special merit of the proposed project." We determined that the Mayor's Agent had properly issued a demolition permit.

Even if an owner cannot show that demolition or alteration is necessary in the public interest, he would be entitled to a demolition or alteration permit if he could show the Mayor that "failure to issue a permit will result in unreasonable economic hardship to the owner." D.C.Code §§ 5–1004(e), 5–1005(f). Under D.C.Code § 5–1002(14):

> "Unreasonable economic hardship" means that failure to issue a permit would amount to a taking of the owner's property without just compensation or, in the case of a low-income owner(s) [sic] as determined by the Mayor, failure to issue a permit would place an onerous and excessive financial burden upon such owner(s).

*See, e.g., 900 G Street Associates v. Department of Housing and Community Development,* 430 A.2d 1387 (D.C.1981).

The Act, therefore, provides an administrative remedy for the property owner who has suffered a restriction so severe as to amount to a taking without just compensation.[15] Although whether a taking has occurred always depends on the individual circumstances, *United States v. Central Eureka Mining Company,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958), we can say as a general matter that the owner would be entitled to a permit from the Mayor if the designation left him with no "reasonable alternative use."[16]

*900 G Street, supra,* 430 A.2d at 1390. Thus, any designation with such a harsh consequence necessarily will be temporary only.

In assessing the length of such a temporary deprivation we observe first that the filing of an application itself serves to prohibit the owner from demolishing or altering the property. However, the Review Board must list the property as an historic landmark within ninety days of "receipt" of the property owner's demolition or alteration permit; "any property not so listed will not be considered an historic landmark." D.C.Code § 5–1002(6)(B). *See supra* at 3 & note 5. The parties disagree on whether the ninety-day limitation begins when the Department of Licenses receives the permit application or when the Review Board receives it. We think that the former interpretation of "receipt" is correct. The ninety-day limit provides the owner with an important protection against undue delay during a period when his freedom to demolish or alter is cut off by the mere filing of a designation application, which can be done by, among others, any private organization which has a purpose of "promotion of historic preservation." The owner may trigger the ninety days by filing his permit application with the Department of Licenses, but has no authority to transmit that application to the Review Board. We agree with the Court in *Weinberg v. Barry,* 604 F.Supp. 390, 396 (D.D.C.1985), *on remand,* 634 F.Supp. 86 (D.D.C.1986), that if the application permit is not transmitted to the Review Board, the governmental agencies cannot "be heard to argue that this [ninety-day] protective feature of the statutory scheme can be eviscerated by agency mismanagement for which [the agencies] are responsible."[17]

**15.** The just compensation clause of the fifth amendment, U.S.Const. amend. V, provides: "[N]or shall private property be taken for public use, without just compensation."

**16.** We note further that the owner may challenge a denial of a permit on petition to this Court. D.C.Code § 5–1012(b). We express no

view on whether the Review Board's designation decision may be challenged in a declaratory or injunctive action in the Superior Court.

**17.** In construing § 5–1002(6)(B) as we have, we do not think it necessary in this case to go further and decide whether failure to meet the ninety-day deadline will render the unlisted

The Act provides the owner with another protection against delay. The Mayor must, with limited exceptions, refer an application for a permit to demolish an historic landmark to the Review Board for a "recommendation," D.C.Code §§ 5–1004(b), 5–1005(b), and must act on the application within 120 days from the Review Board's receipt of the referral. D.C.Code §§ 5–1004(c), 5–1005(c). We perceive a gap in protection in the failure of the Act to require the Mayor to make the referral within a specified time and are concerned about the possibility of delay. But we are unwilling to assume on the information in this record that the Mayor will not act promptly in making the required referral. While we cannot say precisely how long the entire process will take, the limits specified in the Act help assure us that we are not faced with an unreasonable delay before the Mayor decides whether to grant or deny a permit to demolish property designated an historic landmark.

Proceeding on the assumption, therefore, that an owner of designated property might suffer a restriction so serious as to amount to a taking, we think that the duration of that infringement is necessarily limited. When we assess the importance of the private interest in the overall balance, we give significance to the temporary nature of this extreme deprivation. We think that a designation with temporary, albeit extreme, adverse consequences can profitably be likened to pre-termination deprivation of entitlements, which may cause serious loss. *See, e.g., Mathews v. Eldridge, supra,* 424 U.S. at 341–43, 96 S.Ct. at 905–06. In those situations, the general rule is that a full trial-type hearing is not required prior to the final *de novo* hearing. *Id.* at 343, 96 S.Ct. at 906.

(b) *Permanent Deprivation.*

If the Mayor does not grant a demolition or alteration permit, an owner will be permanently prohibited from developing the property. Since the property owner has no right to *de novo* review of the designation decision as part of the Mayor's determination whether or not to grant a demolition or alteration permit, we believe that we should also assess the importance of the private interest on the assumption that the deprivation will have permanent adverse effect.

The economic impact of such a deprivation will vary considerably, depending, among other things, on the owner's economic circumstances, his investment in the property, the present and expected return on it, the potential uses for the property, and the owner's ability otherwise to obtain the necessary permits to build and use the structure as he wishes. The limited record before us does not disclose any significant loss to Donnelly other than an anticipated and speculative return after demolition and development of the properties. Were we deciding the contested case issue on the basis of this record alone, we would be hard put to identify with any precision any substantial adverse impact on Donnelly.[18]

On the other hand, we recognize that an historic designation, like other land use regulations, sometimes can cause substantial diminution of land value and substantial loss of expected revenue. *See, e.g., Penn Central Transportation Company v. New York City,* 438 U.S. 104, 125–28, 98 S.Ct. 2646, 2659–61, 57 L.Ed.2d 631 (1978); *Maher v. City of New Orleans,* 516 F.2d 1051, 1058–66 (5th Cir.1975), *cert. denied,* 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 830

property forever immune from designation as an historic landmark. *See Weinberg v. Barry, supra,* 634 F.Supp. at 90–91.

18. At the January 7, 1985 hearing in front of the Mayor's Agent, Donnelly testified that even if the properties retained their historic designation, they would still be habitable as owner-occupied residences if the interiors were restored.

In addition, Donnelly testified that he had listed the properties for sale at $550,000 and that, with the properties in their present state, he could probably get $350,000 to $400,000 on the open market. Hearing Before the Mayor's Agent at 175, 182–83, 196–98 (January 7, 1985). As noted, *supra* at 4, Donnelly bought the properties for $400,000.

(1976); *Historic Green Springs, Inc. v. Bergland,* 497 F.Supp. 839, 852–53 (E.D. Va.1980); *900 G Street, supra,* 430 A.2d at 1390. The *Mathews v. Eldridge* test, however, is applied to the generality of cases; the "fundamental fairness of a particular procedure does not turn on the result obtained in any individual case." *Walters v. National Association of Radiation Survivors,* 473 U.S. 305, 105 S.Ct. 3180, 3189, 87 L.Ed.2d 220 (1985); *see also Mathews v. Eldridge, supra,* 424 U.S. at 344, 96 S.Ct. at 907. In those cases involving extreme deprivations of protected interests such as the right to liberty itself, *Morrissey v. Brewer, supra;* the right to maintain parental bonds, *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); the right to welfare benefits for needy persons, *Goldberg v. Kelly, supra;* and the right to pursue a chosen profession, *Greene v. McElroy,* 360 U.S. 474, 492, 79 S.Ct. 1400, 1411, 3 L.Ed.2d 1377 (1959), the significance of the interest is evident regardless of variations in individual circumstances. *Cf. Mathews v. Eldridge, supra,* 424 U.S. at 340–41, 96 S.Ct. at 905. In evaluating the private interest in historic designations with permanent effect, we deem it important that return on land use is subject to so many variables that we are unable to say that an historic designation necessarily or even generally will result in serious economic loss.

What we can conclude as a general matter, however, is that any permanent deprivation will not be so serious as to constitute a taking, otherwise the owner will be entitled to a demolition permit. Thus, while an owner may suffer significant loss after a designation not amounting to a taking, he will always retain at least a "reasonable alternative economic use" for the property, *900 G Street, supra,* 430 A.2d at 1390. Moreover, any other property interests he might hold will not be affected by the designation. *See, e.g., Penn Central Transportation Company, supra,* 438 U.S. at 138, 98 S.Ct. at 2666 (reasoning that the owner of the landmark site had not suffered a taking in part because he retained not only a "reasonable beneficial use of the landmark site but also ... opportunities ... to enhance ... other properties.") (Footnote omitted.)

We identify the economic opportunities the owner retains after a designation short of a taking in order to permit a comparison between the permanent economic consequences to him and the consequences that typically call for full procedural protections. In the economic sphere, those protections generally are reserved either for those people who, by adverse administrative action, are deprived of the "very means by which to live," *Compare Goldberg v. Kelly, supra,* 397 U.S. at 264, 90 S.Ct. at 1018; *Willner v. Committee on Character and Fitness,* 373 U.S. 96, 103, 83 S.Ct. 1175, 1180, 10 L.Ed.2d 224 (1963); *and Greene v. McElroy, supra,* 360 U.S. at 492, 496–97, 79 S.Ct. at 1411, 1413 *with National Association of Radiation Survivors,* 105 S.Ct. at 3195–96 *and Mathews v. Eldridge, supra,* 424 U.S. at 340–41, 96 S.Ct. at 905. *Cf. United States v. Kras,* 409 U.S. 434, 445, 93 S.Ct. 631, 637, 34 L.Ed.2d 626 (1973), or are put out of business and deprived by other realistic forms of investment. *See Gonzalez v. Freeman,* 118 U.S.App.D.C. 180, 188, 334 F.2d 570, 578 (1964); *see also Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 203 U.S.App.D.C. 371, 381–82, 384–85, 631 F.2d 953, 963–64, 966–67 (1980); *Horne Bros. Inc. v. Laird,* 150 U.S.App.D.C. 177, 180, 463 F.2d 1268, 1271 (1972). While we do not say that these extreme adverse consequences must always be present before full procedural protections are required, we think that the absence of an extreme deprivation is important in the balancing process we are required to undertake.

(c) *Reliability of Existing Procedures and Probable Value of Additional Procedural Safeguards.*

The second part of the *Mathews* balancing test involves an evaluation of the risk of error in the procedures used and the probable value of additional procedures.

The Review Board's regulations provide extensive procedural protections, including notice of the application for designation; notice of the hearing by publication in the D.C. Register and a newspaper of general circulation; the right to assistance of counsel at the hearing; the right to present evidence, and to rebut evidence offered by other interested parties, and the right to a written decision. The only significant parts of a full trial-type proceeding missing from the Review Board's procedures are the rights to cross-examine and compel the attendance of witnesses. To determine to what extent these procedural protections—in particular, the right to cross-examine—could reduce the risk of an erroneous decision, we must examine the nature of the issues involved in an historic designation.

We set out in the margin the Review Board's criteria for determining whether or not to designate property an historic landmark.[19] Our analysis of these criteria leads us to conclude that the Review Board's inquiry will seldom involve issues of fact that cross-examination will help to resolve. Cross-examination is most helpful where issues of witness credibility and veracity are concerned. *Mathews v. Eldridge,* 424 U.S. at 343–44, 96 S.Ct. at 906–07; *Richardson v. Perales,* 402 U.S. 389, 404–07, 91 S.Ct. 1420, 1428–30, 28 L.Ed.2d 842 (1971); *Greene v. McElroy, supra,* 360 U.S. at 496, 79 S.Ct. at 1413. In historic designations, however, such issues are likely to be rare. To the extent that issues of historical fact are involved, the facts will generally be imbedded in history, beyond the memories of the living. The fact issues will be resolved for the most part by reference to books, newspapers, photographs, platts, designs and drawings, and not by testing truth-telling desire and capacity. Judgments about the historical, architectural or artistic significance of buildings, sites, and architectural styles and the like are generally matters of opinion. While there is dispute over the value of cross-examination of experts,[20] we think that opinions delving into the significance of buildings and places to architecture, history and culture are not particularly suited to exploration through cross-examination.[21]

19. The criteria for determining designations are set out in the Review Board's 1985 Regulations, 32 D.C.Reg. 1979, 1989–90 § 124.1, and provide for a designation when:

(a) They [i.e., the buildings] possess one or more of the following values or qualities:

(1) They are the site of significant events or are associated with persons, groups, institutions or movements that contributed significantly to the heritage, culture or development of the National Capital or the Nation;

(2) They exemplify the significant military, political, economic, social, scientific, technical, educational, historical, archeological, architectural or artistic heritage of the National Capital or the Nation;

(3) They embody the distinguishing characteristics of architectural styles, building types, types or methods of construction, landscape architecture, urban design or other architectural, aesthetic or engineering expressions significant to the appearance and development of the National Capital or the Nation;

(4) They have been identified as notable works of craftsmen, artists, sculptors, architects, landscape architects, urban planners, engineers, builders or developers whose works have influenced the evolution of their fields of endeavor, or the development of the National Capital or the Nation;

(5) They contain information about or evidence of historic or prehistoric events, processes, institutions, design, construction, settlement patterns, or other facets of earlier cultures that is known or established likely to be important to knowledge or understanding of such cultures; or

(6) In the case of natural forms or settings, or substantially natural forms or settings, they reflect significant patterns of settlement or use of the landscape as well as the continuum and evolution of cultural attitudes, norms and values toward the land.

(b) They possess sufficient integrity to convey, represent or contain the values and qualities for which they are judged significant; and

(c) Sufficient time has passed since they achieved significance or were constructed to permit professional evaluation of them in their historical context.

20. *See generally* Boyer, *Alternatives to Administrative Trial-Type Hearings for Resolving Complex Scientific, Economic and Social Issues,* 71 Mich.L.Rev. 111, 127–28 (1972).

21. We recognize that sometimes cross-examination of experts can be useful. For example, there may be instances in which skillful cross-examination would expose the bias of an histo-

The ultimate decision whether to preserve a structure, once its significance has been evaluated, involves aesthetic and policy determinations that do not easily lend themselves to a characterization as either right or wrong.

We do not say that historic designations never involve issues of fact or opinion that could be illuminated by cross-examination. Further, we recognize that "no clear line separates questions of fact from questions of judgment, prediction, policy, evaluation, appraisal, or other such products of thinking processes...." K. DAVIS, ADMINISTRATIVE LAW TREATISE § 12:10 at 227 (1982 Supp.). We believe, however, that in the historic designation process, non-"fact" questions strongly predominate. We therefore conclude that cross-examination will not appreciably add to the ample opportunities already afforded to interested parties to present affirmative and rebuttal evidence and argue their positions to the Board. *See Dupont Circle Citizens Association v. Barry*, 455 A.2d 417, 423–24 & n. 27 (D.C.1983).

### (d) *The Public Interest.*

Assessment of the public interest "includes the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, evidentiary [i.e. trial-type] hearing" prior to every designation. *Mathews v. Eldridge, supra,* 424 U.S. at 347, 96 S.Ct. at 908. Unlike termination of disability benefits or other entitlements enjoyed by large numbers of people, historic designations are not part of a large-scale administrative scheme involving massive governmental resources. Hence, we cannot say that the addition of cross-examination to the already ample procedural protections accompanying designation would impose a significant economic burden on the government.

*Mathews v. Eldridge* makes clear, however, that inquiry into economic and administrative costs is not the only inquiry in the assessment of the public interest. *Id.* at 348, 96 S.Ct. at 909. We also must assess the "function involved." *Id.* at 335, 96 S.Ct. at 903. Thus,

> [t]he ultimate balance involves a determination as to when, under our constitutional system, judicial-type procedures must be imposed upon administrative action to assure fairness.

*Id.* at 348, 96 S.Ct. at 909. We think it significant in striking the ultimate balance that a designation hearing potentially involves participation by a large number of people. In addition to participation by the Review Board itself, its staff, the applicant and the owner, Review Board regulations also allow participation by public agencies, affected Neighborhood Advisory Commissions, any "affected person," and any other person who "wishes to participate." 32 D.C.Reg. 1,988, 1,991 §§ 121.1, 199.1. In view of the potential number and variety of interests represented and the nature of the ultimate issues, what we said in *Chevy Chase, supra,* 327 A.2d at 317, regarding a decision to close a street, aptly characterizes the public interest in not permitting cross-examination:

> To impose "contested case" procedures such as cross-examination on such an inquiry would serve only to frustrate the Council's decision-making. Because the decision to close the street permanently concerns the public generally and because the SRA permits any interested person to offer his views at the public hearing, there is the possibility of numerous persons. Given the problem of undue and repetitive cross-examination, the variance of counsel and pro se parties,

---

rian or city planner disposed toward historic preservation. Even where non-fact issues are involved, cross-examination can assist a fact finder in evaluating the reasoning behind an expert's opinion and testing the assumptions the expert is making. Despite these potential benefits, however, we are persuaded that in the generality of cases the weaknesses of an opinion can be exposed through alternative means such as the use of opposing experts and counsel's own presentation of evidence and argument to the Board.

the enhanced difficulties encountered with the wide range of issues involved in a "public interest" proceeding, the real possibility of redirect and recross and the interplay of different cross-examinations—the potential for havoc is not insignificant. More importantly, there is the real danger that the Council would be forced to focus on technical matters resulting in the obfuscation rather than clarification of the fundamental policy issues.

Moreover, we accord substantial weight to the Review Board's determination that its procedures are fair. *Mathews v. Eldridge*, 424 U.S. at 349, 96 S.Ct. at 909; *Dupont Circle Citizens Association, supra*, 455 A.2d at 424. In particular, we have said that the right to cross-examination in an administrative proceeding is among those rights considered "less 'fundamental' than other[ ] [procedural rights]" and therefore that the decision whether to allow it should be "left to the sound discretion of the officials authorized to issue regulations on the subject." *District of Columbia v. Jones*, 442 A.2d 512, 523 (D.C. 1982).

 In conclusion, after weighing the private and public interest and the role cross-examination might play in reducing error, we cannot say that the Board's ample procedures are not well-tailored "in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard.'" *Mathews v. Eldridge, supra*, 424 U.S. at 349, 96 S.Ct. at 909 (quoting *Goldberg v. Kelly, supra*, 397 U.S. at 268–69, 90 S.Ct. at 1020–21).[22]

## IV.

Because we conclude that neither the Act nor the Constitution entitled petitioner to a trial-type hearing prior to the designation of his properties, this is not a contested case and we have no jurisdiction.

*Dismissed.*

22. In the following cases involving analogous issues in land use regulation the courts have held that due process does not require cross-examination. *Cloutier v. Town of Epping*, 714 F.2d 1184, 1192 (1st Cir.1983) (relying on *Mathews v. Eldridge* to determine that state procedures satisfied due process); *O'Neill v. Town of Nantucket*, 711 F.2d 469, 471–72 (1st Cir.1983); *Clinkscales v. City of Lake Oswego*, 47 Or.App. 1117, 615 P.2d 1164, 1168 (1980); *Kletschka v. Le Sueur County Board of Commissioners*, 277 N.W.2d 404, 405 (Minn.1979); *Barton Contracting Co. v. City of Afton*, 268 N.W.2d 712–16 (Minn.1978). *But see Connecticut Fund for the Environment, Inc. v. City of Stamford*, 192 Conn. 247, 470 A.2d 1214, 1215 (1984) (due process requires cross-examination at hearing to obtain special permit to conduct regulated activities in wetlands area); *Kaelin v. City of Louisville*, 643 S.W.2d 590, 592 (Ky.1982) (relying on *Goldberg v. Kelly*, the court holds cross-examination constitutionally required in zone change hearings).