**RICHARD MILBURN PUBLIC CHARTER ALTERNATIVE HIGH SCHOOL, Petitioner,**

v.

**Peggy Cooper CAFRITZ, et al., Respondents.**

and

**World Public Charter School, Inc., Petitioner,**

v.

**District of Columbia Board of Education, Respondent.**

**Nos. 01–AA–1135, 01–AA–1176.**

District of Columbia Court of Appeals.

Argued Dec. 18, 2001.
Decided May 23, 2002.

Wayne G. Travell, Washington, DC, with whom Douglas R. Kay was on the brief, for petitioner Richard Milburn Public Charter Alternative High School.

George R. Clark, with whom A. Scott Bolden, Edward J. McAndrew, and Richard F. Johns were on the brief, for petitioner World Public Charter School.

Ronald C. Jessamy, with whom Karen J. Miller was on the brief, Washington, DC, for respondent.

Before STEADMAN, FARRELL & WASHINGTON, Associate Judges.

**WASHINGTON, Associate Judge:**

Petitioners, Richard Milburn Public Charter Alternative High School (Milburn) and World Public Charter School, Inc. (World), seek review of the District of Columbia Board of Education's (Board) decision denying them a trial-type contested case hearing prior to the final revocation of their charters pursuant to the District of Columbia School Reform Act of 1995, D.C.Code § 38–1802.13(c) (2001). The charter schools argue that they have a statutory right to a contested case hearing based on the language of the District of Columbia Administrative Procedures Act (DCAPA), D.C.Code § 1–1509 (1999). In the alternative, they argue that they have a constitutional right to a contested case hearing because only such a hearing will provide them with the procedural safeguards required by the due process clause of the Fifth Amendment. We conclude that neither the DCAPA nor the Constitution entitles petitioners to a contested case hearing.

## I.

### A. *School Reform Act of 1995*

In 1996, Congress enacted the District of Columbia School Reform Act of 1995 (School Reform Act), Pub.L. No. 104–134, § 2002, 110 Stat. 1321 (1996) (codified as amended at D.C.Code § 38–1800.02 *et seq.* (2001)), in order to provide a framework for educational reform in selected areas of the public education system, particularly with respect to providing a process for conferring, renewing, and revoking charters.[1] The public charter schools were

---

1. Two separate provisions of the District of Columbia Code reference the revocation procedures applicable to public charter schools. The District of Columbia Council's version, D.C.Code § 38–1702.10(c)(1) (2001), provides for a "formal hearing" upon the proposed revocation of a charter. The version passed by Congress as part of the School Reform Act, *id.* at § 38–1800.02 *et seq.*, provides for "an informal hearing." Although petitioners raised the issue, of which of the two statutes is the governing law, they conceded at oral argument that the version of the statute

seen as a vehicle for increasing educational options for the District's students and parents by providing a more diverse mix of educational programs; testing innovative teaching approaches; promoting community and parent involvement in public education; and dispensing with regulatory and bureaucratic obstacles. The statute allows the charter schools to operate without being subject to the District's education laws and regulations, D.C.Code § 38–1802.04(c)(3)(A) and (B), and to receive funding comparable to that received by the traditional public schools within the system. *Id.* at § 38–1802.10. Under the statute, charters are conferred by an "eligible chartering authority," one of which is the Board of Education, *id.* at §§ 38–1800.02(17)(A); a charter may be issued after various statutory requirements are met by the charter applicant. *Id.* at § 38–1802.03(d).

The School Reform Act sets out requirements with which both the Board and the charter schools must comply once a charter application is approved by the Board and the charter is issued. For example, the public charter schools must submit an annual report to the Board. *Id.* at § 38–1802.04(c)(11). The annual report includes various forms of data concerning the school's progress in meeting programmatic and financial requirements.[2] *Id.* at § 38–1802.04(c)(11). The statute also requires that the public charter schools provide the Board with student enrollment data, *id.* at § 38–1802.04(c)(12), and a program of education. *Id.* at § 38–1802.04(c)(14). The Board is responsible for overseeing each charter school's operations, for ensuring that each school complies with the applicable laws and the provisions of their charters, and for monitoring the progress of each school "in meeting student academic achievement expectations" as reflected in its charter. *Id.* at 38–1802.11(a)(1). The Board may also require a public charter school "to produce any book, record, paper, or document" required by the Board to carry out its oversight function. *Id.* at § 38–1802.11(a)(2).

With respect to revocations, the statute provides that a charter may be revoked within five years of its conferral when the Board determines that the school has "[c]ommitted a violation of applicable laws or a material violation of the conditions, terms, standards, or procedures set forth in the charter, including violations relating to the education of children with disabilities." *Id.* at § 38–1802.13(a)(1)(A). With respect to fiscal mismanagement, a charter

---

passed by Congress as part of the School Reform Act controls.

2. D.C.Code § 38–1802.04(c)(11)(B) provides that the annual report must include the following data:
(i) A report on the extent to which the school is meeting its mission and goals as stated in the petition for the charter school;
(ii) Student performance on districtwide assessments;
(iii) Grade advancement for students enrolled in the public charter school;
(iv) Graduation rates, college admission test scores, and college admission rates, if applicable;
(v) Types and amounts of parental involvement;
(vi) Official student enrollment;
(vii) Average daily attendance;
(viii) Average daily membership;
(ix) A financial statement audited by an independent certified public accountant in accordance with Government auditing standards for financial audits issued by the Comptroller General of the United States;
(x) A report on school staff indicating the qualifications and responsibilities of such staff; and
(xi) A list of all donors and grantors that have contributed monetary or in-kind donations having a value equal to or exceeding $500 during the year that is the subject of the report.

may be revoked if the school "(1) [h]as engaged in a pattern of nonadherence to generally accepted accounting principles; (2)[h]as engaged in a pattern of fiscal mismanagement; or (3)[i]s no longer economically viable." *Id.* at § 38–1802.13(b). However, charters may not be revoked during the first five years of a charter school's existence based exclusively on its failure "to meet the goals and student academic achievement expectations set forth in the charter." *Id.* at § 38–1802.13(a)(2).

The School Reform Act provides procedures that must govern the consideration of a proposed revocation. The Board must provide a charter school with written notice that it proposes to revoke its charter; the notice must indicate the reasons for the proposed revocation; and the notice must apprise the charter school of its right to an informal hearing before a final decision is made. *Id.* at § 38–1802.13(c)(1). If the charter school decides that it would like an informal hearing, it must make such a written request within fifteen days of receiving notice of the proposed revocation. *Id.* at § 38–1802.13(c)(2). Upon receiving such a request, the Board must "set a date and time for the hearing and shall provide reasonable notice of the date and time." *Id.* at § 38–1802.13(c)(3)(A). The notice of the informal hearing must also indicate "the procedures to be followed at the hearing." *Id.* The Board is required to hold the hearing within thirty days of the charter school's written request. *Id.* at § 38–1802.13(c)(3)(B). The Board's final decision must be in writing and must be issued within thirty days after the hearing is completed. *Id.* at § 38–

1802.13(c)(4)(A)(ii). The final decision must also indicate the reasons for the revocation. *Id.* at § 38–1802.13(c)(4)(B). The charter school has the right to judicial review, and the Board's revocation decision "shall be upheld unless the decision is arbitrary and capricious or clearly erroneous." *Id.* at § 38–1802.13(c)(6).

## B. *Milburn*

Milburn was granted a charter to operate effective July 1, 1998.[3] The charter included sections on accountability, reporting requirements and revocation among others, which mirror the various statutory provisions of the School Reform Act. Although the charter did not specifically describe the revocation procedures, it indicated that such procedures will be governed by the School Reform Act.

In a letter dated August 2, 2001, the Board informed Milburn that the Board's Committee on Teaching and Learning planned to hold a special meeting on August 6, 2001, and possibly August 8, 2001 regarding its charter. At the August 6, 2001 meeting, a draft report prepared by a consultant and entitled "Monitoring of the Richard Milburn Public Charter Alternative High School on June 7, 2001" ("monitoring report") was made available to Milburn. The data contained in the report was based on the December 5, 2000 and June 7, 2001 monitoring team visits, and referred to the outcomes of earlier monitoring team visits to the school.[4]

The problems catalogued in the draft monitoring report include the following: little indication that Milburn's Trustees

3. Milburn's mission is to provide small classes and personalized instruction to at-risk, high school students.

4. The December 5, 2000 team was comprised of four retired teachers, a retired principal, a retired federal government official, a special

education consultant, and a retired program director. The June 7, 2001 monitoring team was comprised of two retired principals, two retired teachers, and a retired special education teacher.

were playing "a viable role as legal and fiduciary agents of the school"; a lack of school books, instructional materials and supplies; poor record keeping with respect to student progress; a lack of documentation identifying students who require special education and related services; a failure to submit an accountability plan to the Board despite the fact that such a plan had been due since August 1998, and had been requested during a December 1999 monitoring visit; a failure to provide information to the Board concerning the school's accreditation process, the provision of which is a term of their Contract; disparities between information in the Annual Report submitted by Milburn for School Year (SY) 1999 2000 and information received during monitoring visits on December 6, 1999 and June 1, 2000, concerning that school year; the unavailability of information concerning contracts; a lack of information as to the use of federal program grants; the submission of a cash management plan that was broad and "lacked sufficient detail to ensure the availability of funds throughout the school year"; and the failure to prepare regularly profit and loss statements. The monitors found that Milburn's failure to submit independently audited financial statements for Fiscal Years (FYs) 1999 and 2000, and the reference to Milburn as a Virginia corporation in its Certified Corporate Resolution for Depositing Authorization rose to the level of "serious" violations of its charter.

At the August 6, 2001 meeting, the Board initially voted to place Milburn on probation rather than propose the revocation of its charter. Several Board members believed that this would be the best course of action since their discussions concerning Milburn had not been as extensive as those concerning World and New Vistas Public Charter School, the other charter schools being considered for revocation; Milburn's infractions were considered less egregious than the other faltering charter schools; and there was concern that the student population at Milburn would have no other alternatives in the event that Milburn's charter was revoked. Those in favor of revocation pointed to Milburn's violations of the law in failing to make records available to the Board, and evidence of fiscal mismanagement as reflected by the lack of school supplies and unaddressed maintenance problems. After discussions, the motion to place Milburn on probation was withdrawn and a motion to decide on either probation or revocation at the next Board meeting on August 8, 2001, was approved.

On August 8, 2001, the Board voted unanimously to revoke Milburn's charter. In a letter of that same date, the Board informed Milburn's Board of Trustees that it had begun the process of revoking the school's charter. The letter specifically listed fourteen findings constituting violations of the School Reform Act and Milburn's charter, which served as the basis for the revocation. The Board also informed Milburn that it had the right to request an informal hearing with respect to the proposed revocation provided that the request was made within fifteen days. The violations noted by the Board were based on the findings from the December 5, 2000 and June 7, 2001 monitoring team visits.

In response, on August 22, 2001, Milburn took exception to the Board's informal hearing procedures, and informed the Board that the charter school had the right to a "contested hearing" under the DCAPA, D.C.Code § 1–1509. Milburn's letter referenced the District of Columbia Council's overlapping legislation regarding public charter schools, which provides for a formal hearing pursuant to D.C.Code § 31–2820(c)(1) and (3). In addition, Mil-

burn argued that a contested case hearing was also required by the due process clause of the Fifth Amendment. The Board was not persuaded and, in an August 23, 2001 letter, scheduled an informal hearing for August 27, 2001, and explained the procedures which would govern the proceeding. Pursuant to these procedures, Milburn would have thirty minutes to present oral testimony, including an opening statement, and one hour would be allowed for questions and answers. The Board also requested the submission of written testimony, as well as written responses to the list of fourteen reasons that served as the basis for the proposed revocation. The list of reasons included with this letter is a mirror image of the list included in the Board's August 8, 2001 letter informing Milburn of the proposed revocation decision. On the same day that Milburn was informed that the informal hearing had been scheduled for August 27, 2001, the school requested a continuance. The Board granted the continuance, and rescheduled the meeting for August 30, 2001.

On August 28, 2001, Milburn filed a Petition for Review of Agency Action with this court challenging the Board's August 23, 2001 decision denying Milburn's request for a contested case hearing. On the same day, Milburn filed an Emergency Application for a Stay of Agency Action, requesting an immediate stay of the Board's informal hearing regarding the proposed revocation while this court considered the Petition for Review.

## C. *World*

In a letter dated August 8, 2001, the Board provided World with written notice of the proposed revocation, and indicated that World had the right to an informal hearing before the Board made a final decision. The letter also indicated that a Board monitoring team had visited World on June 5, 2001, to assess the school's compliance with the applicable laws regarding public charter schools and with the terms and conditions of the charter; that a copy of this draft report had been made available to World on July 2, 2001; and that although World had been given a ten-day review period to address the issues raised in the report, the Board had not received a written response.

The findings of the monitoring team upon which the Board relied in proposing revocation included the following violations of law and of the terms and conditions of World's charter: continued violation of the requirements of special education students' Individualized Education Programs (IEPs) and the federal guidelines outlined in the Individuals with Disabilities Educational Act (IDEA); the lack of a plan for providing services for Limited English Proficiency students; failure to ensure verification of residency in the District of Columbia for all enrolled students; failure to submit a corrected and complete accountability plan; failure during the 2000–2001 school year to document any activity or progress toward achieving accreditation within a five-year period as required by the charter; failure to submit a complete annual report for SY 1998–1999 or SY 1999–2000; failure to submit background check reports for all employees; failure to submit tuberculin skin reports for all employees; and failure to document adherence to contracting procedures in awarding several contracts.

At the August 6, 2001 meeting regarding the proposed revocation, the Board voiced its concerns over World's fiscal mismanagement, failure to provide documents in a timely manner, lack of responsiveness to the monitoring report's findings, and the school's problems with obtaining adequate space for its students. The vote in favor of the proposed revocation was unanimous,

and on August 8, 2001, the Board sent a letter to World indicating the basis for their decision.[5]

World requested an informal hearing on the proposed revocation in a letter dated August 23, 2001. On the same day, the Board informed World that a hearing had been scheduled for August 27, 2001. The letter also explained the procedures that would be relied upon during the hearing: a presiding officer of the Board would present the bases for the proposed revocation; the School's Trustees would be given up to thirty minutes to present information to the Board concerning the proposed revocation; and the Board members would ask questions of those presenting information on behalf of World. In an August 24, 2001 letter, World requested a continuance. The Board rescheduled the hearing for August 30, 2001. The hearing was subsequently rescheduled once more for September 5, 2001.

On September 4, 2001, World requested an immediate stay of the Board's August 30, 2001 decision to hold a revocation hearing on September 5, 2001. On the same day, World also filed a Petition for Review of the Board's decision with this court, arguing that the Board had failed to provide reasonable notice of the revocation hearing, and that World was entitled to a contested case hearing under D.C.Code § 1–1509. World requested a stay of the Board's revocation proceeding until this court had reviewed the Petition. The Milburn and World cases were consolidated on September 5, 2001, and the Board's proceedings were stayed at that time.

## II.

Petitioners argue that they were erroneously denied a contested case hearing because the DCAPA requires such a hearing or, in the alternative, because such a hearing is required by the due process clause of the Fifth Amendment. The DCAPA defines a "contested case" as "a proceeding before the Mayor or any agency in which the legal rights, duties, or privileges of specific parties are required by any law (other than this subchapter), or by constitutional right, to be determined after a hearing before the Mayor or before an agency." D.C.Code § 1–1502(8) (1999).[6] A "contested case"[7] hearing is understood to mean "a trial-type hearing," which is "implicitly required by either the organic act or constitutional right." *Chevy Chase Citizens Ass'n v. District of Columbia Council,* 327 A.2d 310, 314 (D.C.1974) (en banc). *See also Communication Workers of Am. Local 2336 v. District of*

---

5. In an August 10, 2001 letter, the Board informed the parents of World students of the August 8, 2001 vote to begin the revocation process with respect to that charter school, of the possibility of the school's closure, and that parents should begin to consider the options available elsewhere for Fall enrollment.

6. Among the types of cases specifically excluded from DCAPA contested case treatment are "[p]roceedings in which decisions rest solely on inspections, tests, or elections." D.C.Code § 1–1502(8)(C).

7. Among the procedures required during contested case proceedings are the following: reasonable notice of the hearing must be provided; the notice must state the time, place, and issues involved; an opportunity must be provided to all parties to present evidence and argument; the agency bears the burden of proof; any oral testimony or documentary evidence may be placed on the record unless irrelevant or cumulative; every party has the right to present a case or defense orally or through written testimony; all parties have the right to the assistance of counsel, to present rebuttal evidence and to cross-examine witnesses; the agency is required to maintain an official record; transcripts are available upon a timely request; decisions must be based on the record and must be in writing; and the decision must include findings of fact and conclusions of law. D.C.Code § 1–1509.

*Columbia Taxicab Comm'n,* 542 A.2d 1221, 1223 (D.C.1988).

 This court has jurisdiction to determine whether the public charter schools were improperly denied a contested case hearing.[8] *See Timus v. District of Columbia Dep't of Human Rights,* 633 A.2d 751, 757 (D.C.1993) (en banc); *Auger v. District of Columbia Bd. of Appeals & Review,* 477 A.2d 196, 205–06 (D.C.1984). We have the authority to order a contested case hearing when an agency withholds the right to such a hearing in error. *Timus, supra,* 633 A.2d at 757; *but see* note 18, *infra.* In deciding whether the charter schools are entitled to a contested case hearing, we may make "[s]uch merits rulings on issues inherent in a jurisdictional analysis" since issues of jurisdiction and the merits may "turn out to be coextensive." *Id.* at 757–58. Since a contested case hearing must be provided when it is "either statutorily or constitutionally compelled" and "adjudicatory as opposed to legislative in nature," *id.* at 756, we will first consider whether the School Reform Act does in fact provide for such a hearing and, if it does not, whether such a hearing is nonetheless required by the due process clause of the Constitution.

We proceed with the required analysis here, cognizant of the deference we owe to Congress and local policymakers in the area of education in the District of Columbia. Within the context of procedures relied upon by educational institutions and local educational bodies, the Supreme Court has emphasized the need for judicial restraint: "[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint ... By and large, public education in our Nation is committed to the control of state and local authorities." *Board of Curators of the Univ. of Missouri v. Horowitz,* 435 U.S. 78, 91, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). Moreover, we have also recognized that "the nature of the issues to be determined will be determinative in ascertaining what Congress intended when it provided for a hearing." *Donnelly Assocs. v. D.C. Historic Pres. Review Bd.,* 520 A.2d 270, 278 (D.C.1987).

### A. Whether a contested case hearing is required by statute

The charter schools argue that they are entitled to a contested case hearing because the DCAPA itself compels the Board to conduct such a hearing when it is engaged in "weighing particular information and arriving at a decision directed at a party's specific rights." Petitioners, however, have misread the DCAPA and our case law by looking to *that* statute as the source of their purported right to a contested case hearing. Instead, the DCAPA provides that contested case proceedings must be "required by a law (*other than this subchapter*)." D.C.Code § 1–1502(8) (emphasis added); *see also Angell v. Henneberry,* 92 Md.App. 279, 607 A.2d 590, 601 (Md.1992) ("the APA itself does not grant a right to a hearing"). Thus, the DCAPA does not grant a right to a contested case hearing, but provides that such a right must be derived either from the School Reform Act or by constitutional mandate. *See United States v. District of Columbia Bd. of Zoning Adjustment,* 644 A.2d 995, 998 (D.C.1994); *Donnelly Assocs., supra,* 520 A.2d at 277.

 In determining whether Congress intended for a trial-type contested

---

8. Since our jurisdiction only extends to determining whether petitioners' requests for contested case hearings were erroneously denied by the Board, we do not reach petitioners' challenges to the adequacy of the notice they received. Such claims are subject to review by the Superior Court. D.C.Code § 38–1802.13(c)(6)(A).

case hearing to take place before the revocation of a public school charter, we begin by considering the language of the School Reform Act—not the DCAPA—in order to determine if "the language is plain and admits of no more than one meaning." *Peoples Drug Stores, Inc. v. District of Columbia,* 470 A.2d 751, 753 (D.C.1983) (en banc); *see also Timus, supra,* 633 A.2d at 758. We expect that "the intent of the lawmaker is to be found in the language ... used," and we construe those words according to their plain meaning. *Id.* If the statute's language is "clear and unambiguous and will not produce an absurd result, we will look no further." *Hayes v. United States,* 707 A.2d 59, 62 (D.C.1998). "Readily disregarding the plain meaning of a statute creates a risk that the courts are exercising their own desires instead of those of the legislature." *Berryman v. Thorne,* 700 A.2d 181, 184 (D.C.1997).

■ The language of the School Reform Act provision governing revocations provides that a charter school has the right to an "informal hearing" after receiving notice of the proposed revocation of its charter. D.C.Code § 38–1802.13(c). Even though neither the School Reform Act nor the legislative history defines what constitutes an "informal hearing," we may infer that something less than a contested case hearing is required. Congress's reference in the statute to an "informal hearing" does not lend itself to any ambiguity that requires us to determine whether it may have had a contested case hearing in mind. The conclusion that a trial-type contested case hearing is not required is also supported by language contained in the notice provision indicating that the eligible chartering authority "shall provide ... procedures to be followed at the hearing" to the Board of Trustees of the charter school pursuant to D.C.Code § 38–1802.13(c)(3)(A). *See Hotel Ass'n of Wash-*

*ington v. District of Columbia Minimum Wage & Indus. Safety Bd.,* 318 A.2d 294, 304–05 (D.C.1974) (organic act that provides for a hearing and also prescribes procedures agency should follow "do[es] not comport with the notion that the statutory scheme requires a 'contested case' type hearing").

Thus, we conclude that congressional intent to provide for an "informal hearing" rather than a trial-type contested case hearing is explicit from the language of the provision. However, our conclusion that Congress did not intend that a contested case hearing take place before a charter revocation does not end our inquiry, since a contested case hearing may be required by the due process clause. *See Donnelly Assocs., supra,* 520 A.2d at 278 (requirement for trial-type hearing "will be read into the statute to save the statute from [constitutional] invalidity") (citations omitted). Consequently, we must determine whether the due process clause is implicated when a charter is at issue and whether only a contested case proceeding prior to the charter's revocation will meet constitutional requirements.

**B. *Whether a contested case hearing is required by the due process clause***

Petitioners argue that even if a contested case hearing is not required by the DCAPA, it is constitutionally compelled because they enjoy a property and liberty interest in their respective charters. If the School Reform Act provides for less procedural safeguards, they argue, it must be deemed unconstitutional. The Board responds that due process does not require a contested case hearing, and that the School Reform Act's provision for an informal hearing is constitutionally adequate.

■ The due process clause provides that "[n]o person shall be ... deprived of

life, liberty, or property, without due process of law." U.S. CONST. amend. V. The procedural due process guarantee imposes procedural requirements on the government before it deprives individuals of protected interests. *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Although protected by the Constitution, such interests are not created by it. *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Instead, property and liberty interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577, 92 S.Ct. 2701. When protected interests are implicated, the Constitution requires "notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Bell v. Burson*, 402 U.S. 535, 542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). Thus, in order to determine whether a contested case hearing is constitutionally mandated before the government revokes a charter, we must conduct a two-part inquiry. *Ingraham v. Wright*, 430 U.S. 651, 672, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *see also District of Columbia v. Jones*, 442 A.2d 512, 516–17 (D.C.1982). First, we must decide "whether the asserted individual interests are encompassed within the [Fifth Amend-

ment's] ... protection of 'life, liberty, and property.'" *Id.* Second, if protected interests are at issue, we must then determine what procedures are required to satisfy due process. *Id.*

#### 1. *Liberty or Property Interests*

World and Milburn contend that they enjoy property and liberty interests in their respective charters. At oral arguments, the Board conceded that the public charter schools have a property interest in their charters. In light of the Board's concession that the due process clause is implicated, we now turn to consider whether due process requires a contested case hearing.

#### 2. *What process is due*

 In order to satisfy constitutional due process requirements, the hearing must take place "at a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (citations omitted). These requirements have been interpreted to mean that a hearing should take place prior to the deprivation of the protectable interest,[9] *Fuentes, supra* note 9, 407 U.S. at 82, 92 S.Ct. 1983, and that the right to appear and argue against the deprivation should be afforded. *See id.* at 81, 92 S.Ct. 1983 ("when a person has an opportunity to speak up in his own defense, and when the State must listen to what he [or she] has to say," erroneous deprivations of liberty and property may be avoided); *see also Memphis Light, Gas & Water Div. v.*

---

**9.** However, a predeprivation hearing is not required in those "extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." *Fuentes v. Shevin*, 407 U.S. 67, 82, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *see also Zinermon v. Burch*, 494 U.S. 113, 128, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) ("In some circumstances ... the Court

has held that a statutory provision for a postdeprivation hearing ... satisfies due process"); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (postdeprivation hearing may be constitutionally sufficient when there is the "necessity of quick action by the State or the impracticality of providing any predeprivation process").

*Craft*, 436 U.S. 1, 16, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) ("[A] hearing in its very essence demands that he [or she] who is entitled to it shall have the right to support his [or her] allegations by argument however brief, and, if need be, by proof, however informal") (citations omitted).[10]

■■■ The Supreme Court has stressed the flexibility of the procedural due process requirement. *See Mathews, supra*, 424 U.S. at 334, 96 S.Ct. 893 ("[d]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place, and circumstances," but rather it is "flexible and calls for such procedural protections as the particular situation demands"); *see also Boddie, supra*, 401 U.S. at 378, 91 S.Ct. 780 ("The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings"). Thus, in its cases, the Supreme Court has avoided specifying precise requirements for satisfying due process since "[t]he al-ternative methods of compliance are several ... [and][t]he area of choice is wide." *Bell, supra*, 402 U.S. at 542–43, 91 S.Ct. 1586; *see also Fuentes, supra* note 9, 407 U.S. at 96–97, 92 S.Ct. 1983 ("The nature and form of ... prior hearings ... are legitimately open to many potential variations and are a subject, at this point, for legislation—not adjudication"). The hearing may be "formal or informal,"[11] *Fuentes, supra* note at 9, 407 U.S. at 90, 92 S.Ct. 1983, and the pretermination hearing "need not be elaborate" and, generally, "something less than a full evidentiary hearing is sufficient prior to adverse administrative action." *Cleveland Bd. of Educ., supra*, 470 U.S. at 545, 105 S.Ct. 1487 (internal citations and quotations omitted). Moreover, the Court noted that "the ordinary principle established in our decisions [is] that something less than an evidentiary hearing is sufficient prior to adverse administrative action." *Mathews, supra*, 424 U.S. at 343, 96 S.Ct. 893.

■■■ A determination as to whether a contested case hearing is constitutionally

---

10. Moreover, "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg, supra*, 397 U.S. at 268–69, 90 S.Ct. 1011. Although written submissions might be inappropriate when required of individuals with limited educational backgrounds or where credibility is at issue, *id.* at 269, 90 S.Ct. 1011, the Court has also indicated that there are certainly circumstances where such would constitute a constitutionally adequate hearing. *Mathews, supra*, 424 U.S. at 343–44, 96 S.Ct. 893.

11. Indeed, *Goldberg, supra*, 397 U.S. at 264, 90 S.Ct. 1011, is the only case in which the Supreme Court interpreted the due process clause to require a full evidentiary hearing prior to the deprivation of the property interest—welfare benefits in that case. The Court there stressed that such a pretermination evidentiary hearing was required in the welfare context because welfare benefits "provide the means to obtain essential food, clothing, housing and medical care," and the "termi-nation of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he [or she] waits." *Id.* at 264, 90 S.Ct. 1011 (emphasis in the original). There the Court held that the City of New York's interest in "conserving fiscal and administrative resources," *id.* at 265, 90 S.Ct. 1011, was not outweighed by the private interests in the welfare context since, as the lower court there had observed, "the stakes are simply too high for the welfare recipient, and the possibility for honest error or irritable misjudgment too great, to allow termination of aid without giving the recipient a chance, if he so desires, to be fully informed of the case against him so that he may contest its basis and produce evidence in rebuttal." *Id.* at 266, 90 S.Ct. 1011. However, the Supreme Court has made clear that "[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decision-making in all circumstances." *Mathews, supra*, 424 U.S. at 348, 96 S.Ct. 893.

required before the school charters are revoked requires analysis of the governmental and private interests affected. *See id.* at 334, 96 S.Ct. 893. Determining what process is due in a particular situation involves balancing three factors, which reflect the competing interests at issue:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. 893. It is the charter schools' burden "to persuade us to depart from 'the ordinary principle' established by [Supreme Court] decisions, that something less than a [trial-type] hearing" is constitutionally required. *Donnelly Assocs., supra,* 520 A.2d at 279 (quoting *Mathews, supra,* 424 U.S. at 343, 96 S.Ct. 893).

Applying the *Mathews* balancing test, the charter schools argue that a trial-type contested case hearing is constitutionally mandated since the Board's procedures will not provide procedural safeguards required by the Fifth Amendment such as the right to call and cross-examine witnesses and a final written decision that includes findings of facts and conclusions of law. The charter schools argue that only a contested case hearing will adequately safeguard their private interests in retaining their charters, and the Board's procedures will result in "a high risk" of erroneous deprivation which is not offset by the government's interest in a less burdensome procedure. In opposition, the Board argues that petitioners' private interests are outweighed by "the public interest in an educational system that meets the needs of our children and a government that is not burdened by a requirement that full-blown hearings be held in such situations." Furthermore, the Board insists that the risk of erroneous deprivation of the schools' charters is minimized by the statutorily provided procedures and the procedures devised by the Board to govern the informal hearing.

■ In applying the *Mathews* balancing test, we conclude that due process does not require that the Board conduct a contested case hearing before deciding to revoke a public school charter.

### (a) Private Interest

In determining the nature of the loss, we must consider the "importance of the private interest and the length or finality of the deprivation." *Logan, supra* note 9, 455 U.S. at 434, 102 S.Ct. 1148. The Supreme Court has recognized that government action can have a "significant effect" on a business, particularly as here when such action effectively puts the charter schools out of business by depriving them of their charters. *See Old Dominion Dairy Prods. v. Secretary of Defense,* 203 U.S.App. D.C. 371, 381, 631 F.2d 953, 963 (1980).

The schools maintain that they have made "a substantial investment of time and energy" establishing their respective schools. In analyzing their private interests in retaining their charters, the schools also include the deprivation to the students and their parents, as well as to the staff and teachers who will be losing their livelihoods. The Board acknowledges that the charter schools have a significant private interest in retaining their charters.

### (b) Risk of erroneous deprivation

The *Mathews* Court indicated that the relevant inquiry when considering the risk of erroneous deprivation should involve a

determination as to "the fairness and reliability of the existing pretermination procedures, and the probable value, if any, of additional procedural safeguards." *Mathews, supra,* 424 U.S. at 343, 96 S.Ct. 893. Thus, the second *Mathews* factor demands that we consider the risk that petitioners' charters will be erroneously revoked as a consequence of the procedures provided by the statute and the Board, as well as the probable value of additional procedures that petitioners argue are constitutionally mandated.

We conclude that the statutory procedures and those adopted by the Board for these charter revocation proceedings are sufficiently fair and reliable to pass constitutional muster under the *Mathews* balancing test. The School Reform Act provides charter schools facing a proposed revocation with several procedural protections, including written notice of the right to an "informal hearing," and that such notice must also state the reasons for the proposed revocation. D.C.Code § 38–1802.13(c)(1). With respect to the request for a hearing, the Board "shall provide reasonable notice of the date and time, as well as the procedures to be followed at the hearing." *Id.* at § 38–1802.13(c)(3)(A). If the Board decides to revoke the charter after the informal hearing, it must "state in its decision the reasons for the revocation," and the school has the right to appeal the Board's decision to the Superior Court. *Id.* at § 38–1802.13(c)(4) and (6). In addition, the procedures established by the Board for the conduct of the informal hearing provided for thirty minutes to present testimony, including an opening statement; the submission of testimony in written form; one hour of questions and answers; and written responses to the list

of reasons forming the basis for the revocation decision. Petitioners were apprised of the Board's informal procedures in advance of the informal hearing. *See Jones, supra,* 442 A.2d at 522 (the notice requirement of procedural due process requires that petitioner should be informed prior to the hearing concerning "the manner in which [it] would be conducted").

Our review of the nature of the Board's inquiry during revocation proceedings also supports the conclusion that additional procedural safeguards are not constitutionally required. *See Mathews, supra,* 424 U.S. at 343, 96 S.Ct. 893 ("Central to the evaluation of any administrative process is the nature of the relevant inquiry"). The Board's proposed revocation of the Milburn and World charters is based on the two schools' alleged violations of applicable laws and their charters by engaging in fiscal mismanagement and failing to comply with statutory obligations requiring the submission of data and documentation concerning various aspects of the charter schools' operations and programming. Thus, the informal hearing will be driven by an inquiry as to whether the charter schools complied with these obligations. Such a determination requires the Board to undertake a "sharply focused and easily documented decision." *See Mathews, supra,* 424 U.S. at 343, 96 S.Ct. 893. This is certainly not a situation in which "a wide variety of information may be deemed relevant," or "issues of witness credibility and veracity are critical to the decisionmaking process." *See id.* at 343–44, 96 S.Ct. 893. Rather, the inquiry is driven by whether or not the charter schools complied with statutory requirements, an inquiry which can, and indeed, must be answered primarily with documentary evidence.[12] Even if

---

**12.** For example, in a September 24, 2001 affidavit, James Peal, a member of Milburn's Board of Trustees, indicated that many of the monitors' findings were "outdated, inaccurate or were matters which could be easily corrected." We do not see why only a contested

we allow, as the *Mathews* Court did, that credibility might be an issue in reports prepared by specialists, such exceptional circumstances should not drive our analysis since "procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Id.* at 344, 96 S.Ct. 893. Moreover, where the information required by the decisionmaker is "amenable to effective written presentation," "the value of an evidentiary hearing ... to an accurate presentation of those factors to the decisionmaker does not appear substantial." *Id.* at 345 n. 28, 96 S.Ct. 893.

In addition, an explanation from the Board as to the information relied upon in making its decision and access to such information provides further procedural safeguards against erroneous deprivations. *See id.* at 345–46, 96 S.Ct. 893. As a consequence, public charter schools facing revocation proceedings will be in a position to provide the agency with additional evidence or arguments to refute the agency's determination and "to 'mold' their arguments to respond to the precise issues which the decisionmaker regards as crucial." *See id.* at 346, 96 S.Ct. 893. Here, the record reflects that Milburn received a copy of the monitoring report at the August 6, 2001 Board meeting, and that World received a copy of the draft report of the monitors' findings with respect to its school on July 2, 2001. The August 8, 2001 letter, which apprised the charter schools that revocation proceedings had been initiated, specifically referred to the respective reports as the basis for the proposed revocation decisions and listed the findings that the Board relied upon in reaching its decision. Thus, both schools

were well informed as to the basis for the revocation decisions and were provided with an opportunity to address these specific findings through both oral and written testimony and written submissions during the informal hearing.

Petitioners argue that the procedures provided by the School Reform Act and the Board are inadequate because they do not include the right to call witnesses and the right to cross-examination found in contested case proceedings. However, in determining whether the addition of a right to call and cross-examine witnesses "could reduce the risk of an erroneous [Board] decision, we must examine the nature of the issues involved" in a charter revocation. *See Donnelly Assocs., supra,* 520 A.2d at 283; *see also Mathews, supra,* 424 U.S. at 343, 96 S.Ct. 893 ("Central to the evaluation of any administrative process is the nature of the relevant inquiry"). Moreover, this court has recognized that "the right to cross-examination in an administrative proceeding is among those rights considered less fundamental than other procedural rights and therefore that the decision whether to allow it should be left to the sound discretion of the officials authorized to issue regulations on the subject." *Donnelly Assocs., supra,* 520 A.2d at 285 (quoting *Jones, supra,* 442 A.2d at 523 internal quotations omitted).

In arriving at the decision to revoke a charter within five years after it was conferred, the Board must find that the charter school has "[c]ommitted a violation of applicable law or a material violation of the conditions, terms, standards, or procedures set forth in the charter, including violations relating to the education of children with disabilities;" or that the school "(1) [ha]s engaged in a pattern of nona-

case proceeding will be conducive to addressing such claims. Both the statutory procedures and the Board's procedures provide

opportunity for the charter schools to respond to concerns with the monitoring team's findings.

dherence to generally accepted accounting principles; (2)[h]as engaged in a pattern of fiscal mismanagement; or (3)[i]s no longer economically viable." D.C.Code § 38–1802.13(a) and (b). It appears to us that the Board's inquiry during revocation proceedings as indicated by the statutory guidelines will ordinarily involve issues of fact which will not be elucidated by calling witnesses and conducting cross-examination because witness reliability is rarely at issue during this type of proceeding. *See Donnelly Assocs., supra,* 520 A.2d at 283. Rather, the overwhelming majority of factual issues will ordinarily be addressed by consulting the documentation that the charter schools are statutorily required to provide, as well as the oral and written testimony and written responses that are provided for in the Board's procedures, "not by testing truth-telling desire and capacity." *Id.* Of course, when the Board alleges that the charter schools have failed to provide required documentation or that the documentation was inadequate, the charter schools will have an opportunity to show that adequate documentation was in fact provided.

The decision as to whether to finally revoke a school's charter within the first five years will be driven by the failure or diligence of the charter school to document or effectuate its compliance with the School Reform Act and its charter, and we fail to see, at this point, what the right to cross-examination and other requested procedures would significantly add to the quality of decisionmaking. For example, the Board's conclusion that Milburn had engaged in fiscal mismanagement was based on a finding by the monitors that the charter school consistently failed to provide financial audits on a timely basis. Fiscal mismanagement was also found to be reflected in the chronic lack of basic school supplies and unaddressed maintenance problems at the school. In the event the Milburn representatives take issue with the accuracy of the monitoring report's findings as to what was or was not submitted to the Board, what school materials were available to students, or the conditions at the school facility, the charter school will have an *opportunity to address* their position in both oral and written testimony, during a question and answer period with the Board, and in written responses to the specific violations. Thus, cross-examination is unlikely to add to the opportunities already provided to the charter schools "to ensure that they are given a meaningful opportunity to present their case." *See Mathews, supra,* 424 U.S. at 349, 96 S.Ct. 893.

The schools also argue that they should have the right to call individual members of the monitoring teams and the Board members as witnesses regarding the grounds for the revocation. We find such an approach perplexing. A more suitable means of refuting the various purported errors made by the monitors and ultimately relied upon by the Board would be to furnish the Board with documentation indicating that the schools had in fact complied with their statutory duty to furnish financial and other data.

In addition, the charter schools take issue with the Board procedure allowing them only thirty minutes to present oral testimony.[13] However, we do not see why that time allotment is so unreasonable so as to preclude our deference to the Board's decision as to which procedures are appropriate. *See Mathews, supra,* 424 U.S. at 349, 96 S.Ct. 893 ("In assessing what process is due in this case, substantial weight must be given to the good-faith judgments

---

**13.** During oral arguments, the Board's counsel indicated that, in practice, the charter schools usually get well over thirty minutes for oral testimony.

of the individuals charged by Congress with the administration of [the agency] that the procedures they have provided assure fair consideration"). In addition to the thirty minutes to provide oral testimony, petitioners have other means to press their arguments. The Board's procedures also provide for written testimony, a one hour question and answer period, and written responses to the violations forming the basis for the revocation.[14] Moreover, pursuant to statute, the charter schools have the right to judicial review of any revocation decision "by an appropriate court of the District of Columbia." D.C.Code § 38–1802.13(c)(6).

In sum, in considering the second *Mathews* factor, we conclude that petitioners have not shown that there will be sufficient "probable value" to petitioners of "additional or substitute procedural safeguards" in reducing "the risk of erroneous deprivation" of their private interests in the charters. Given the nature of the Board's revocation proceedings, driven as they are by documentary evidence, and the procedures established by the School Reform Act and the Board, the risk of erroneous deprivation is minimalized.

### (c) The governmental interest

The governmental interest includes "the administrative burden and other societal costs that would be associated with requiring, as a matter of constitutional right, an evidentiary hearing upon demand in all cases prior to the termination" of a protected interest. *Mathews, supra,* 424 U.S. at 347, 96 S.Ct. 893. The most obvious burden in the context of the charter revocation proceedings from additional proce-

dural safeguards would be the delay involved by more elaborate proceedings, as well as the cost of continuing to provide public funding to charter schools that have flouted their statutory obligations while the revocation decision is pending. *See id.* Although the record before us does not provide any indication of what the additional costs of a contested case hearing would be, the Supreme Court has indicated that their "experience with the constitutionalizing of government procedures suggests that the ultimate additional costs in terms of money and administrative burden would not be insubstantial." *Id.* Moreover, additional procedural safeguards are unjustified if they are not accompanied by a reduction in erroneous deprivations:

> the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed. At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost.

*Id.* at 348, 96 S.Ct. 893; *see also Sterling v. District of Columbia Dep't of Employment Servs.,* 513 A.2d 253, 255 (D.C.1986) (holding that consistent with due process, telephone hearings may be conducted to resolve interstate unemployment compensation claims because abolition of such hearings would not materially reduce the risk of erroneous deprivations and such hearings are "a reasonable means of conserving fiscal and administrative resources").[15]

---

14. Although the petitioners continually emphasize that the Board's procedures are less than those provided for in the DCAPA, due process is satisfied by less than the trial-type procedures of the DCAPA. *See Mathews, supra,* 424 U.S. at 348, 96 S.Ct. 893.

15. Yet the Supreme Court reminds us that these costs are not to be given "controlling weight in determining what process is due." *Mathews, supra,* 424 U.S. at 343, 96 S.Ct. 893; *see also Bell, supra,* 402 U.S. at 540, 91 S.Ct. 1586 (the additional costs of enhanced proce-

In weighing the third *Mathews* factor, our inquiry is not limited to the costs and burdens of requiring a trial-type contested case hearing, but also extends to considering the "function involved." *See Cloutterbuck v. Cloutterbuck*, 556 A.2d 1082, 1086 (D.C.1989). In considering the pre-revocation proceedings, "we may look to the statute for the government interest" in conducting an informal hearing. *Id.* The government function at issue here is the Board's duty to ensure that charter school students receive the type of educational opportunities and other services they deserve by overseeing the operations of public charter schools and revoking the charters of those schools that do not operate within the law. By requiring an informal hearing, we may infer that Congress "determined that ... [the government] interest is best served" by such a hearing. *See id.* Clearly, the purpose of requiring the less elaborate informal hearing as opposed to a formal evidentiary hearing is to provide the Board with an expeditious means to close down public charter schools that fail to meet statutory requirements and the terms and conditions of their individual charters while paying due regard to the public charter school's private interest in the charter. Moreover, pursuant to statute, the charter schools have the right to judicial review of any revocation decision "by an appropriate court of the District of Columbia." D.C.Code § 38–1802.13(c)(6).

The cases relied upon by Milburn and World to support their argument in favor of a contested case hearing are distinguishable. Both *Woods v. District of Columbia Nurses' Examining Bd.*, 436 A.2d 369 (D.C.1981) and *District of Columbia v. Douglass*, 452 A.2d 329 (D.C.1982), were cases in which the relevant statutes made no allowance for any type of hearing before the deprivation of the protected interests, a nursing license and a license to practice naturopathic medicine, respectively. Treating as the two available alternatives in those cases no hearing or a contested case hearing pursuant to the DCAPA, this court concluded that due process required a contested case hearing where the right of an individual to practice his or her livelihood was at stake. *Woods, supra,* 436 A.2d at 373; *Douglass, supra,* 452 A.2d at 332. We consider by contrast, a statutory scheme which provides for an informal but meaningful hearing before a school's charter can be revoked. Given that we face a different procedural posture than did the *Douglass* and *Woods* courts, we are not constrained to follow their result.[16]

In sum, after balancing the private and governmental interests and the effect that the right to cross-examine witnesses and the other requested procedures would contribute to reducing erroneous deprivations, we conclude that, given the "decision to be made" and "the capacities and circumstances of those who are to be heard," the charter schools have not met their burden of establishing that a contested case hearing is constitutionally required. *See Math-*

---

dures "must be kept in mind ... [but such considerations do] not justify denying a hearing meeting the ordinary standards of due process"); *Fuentes, supra* note 9, 407 U.S. at 92, 92 S.Ct. 1983 ("the establishment of prompt efficacious procedures to achieve legitimate state ends is a proper state interest worthy of cognizance in constitutional adjudication. But the constitution recognizes higher values than speed and efficiency").

**16.** Petitioners devote many paragraphs of their brief to the proposition that a contested case hearing should always be required when license revocations and, by analogy, charter revocations, are at issue. However, we find no such categorical requirement. *See Bell, supra,* 402 U.S. at 540, 91 S.Ct. 1586 (hearing required to determine liability prior to license suspension need not be a full adjudication).

*ews, supra,* 424 U.S. at 349, 96 S.Ct. 893. Given the constitutionally adequate procedures provided by statute and by the Board, "there is no reason for an additional judicially-imposed procedure which does not enhance in any significant way the protection" of a charter school's private interest in its charter. *See Brown, supra,* 682 A.2d at 1140. The constitution in itself does not require a contested case hearing that might compromise the Board's significant interest in administering the District of Columbia's public charter schools within the guidelines established by Congress under the School Reform Act.

We wish to emphasize that we deal here only with absolute constitutional minimums, carrying out our judicial duty as mandated by the Supreme Court, with deference both to the expressed judgment of the legislature and to the agency with its special knowledge of its mission. Certainly views as to the appropriate procedures in any given circumstance can reasonably differ and there is nothing whatever to prevent an expansion of protections by the Board beyond constitutional requirements.

Furthermore, we have come to our present judgment in a somewhat abstract context, relying upon our understanding of the issues that are actually at stake and the procedures proposed to be followed by the agency in the ultimate revocation hearings.[17]

### III.

 Because we conclude that neither the School Reform Act nor the due process clause of the Fifth Amendment requires a contested case hearing before the final revocation of a public school charter,[18] we deny petitioners' request that we order such a hearing and affirm the denial by the Board of petitioners' request for a contested case hearing.

*So ordered.*

---

17. As already noted, the charter schools filed their petition for review prior to the holding of the hearing itself, asserting that they had a right to a contested case hearing rather than the type proposed by the Board. They successfully sought and received a stay of further proceedings from this court, and we do not at this late point in these expedited appeals propose to explore any possible prematurity.

18. The Board argues that even in the event that the charter schools were entitled to a contested case hearing, they waived this right when they entered contracts with the Board which specifically provided that they had the right to request an informal hearing. Procedural due process requirements may be waived. *Fuentes, supra* note at 9, 407 U.S. at 94, 92 S.Ct. 1983; *D.H. Overmyer Co. v. Frick Co.,* 405 U.S. 174, 185, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972); *Boddie, supra,* 401 U.S. at 379, 91 S.Ct. 780. However, the record before us is insufficient to determine whether the charter schools voluntarily, knowingly, and intelligently waived their right to a contested case hearing if such a hearing was constitutionally mandated. *See Fuentes, supra* note at 9, 407 U.S. at 94–95, 92 S.Ct. 1983. The record as to the circumstances of the signing of the contract are confined to the affidavit of Houston Conley, Chairman of Milburn's Board of Trustees, who indicated that he merely signed the contract after being instructed to do so by the Board and that the contract was not a negotiated document.