The KAMIT INSTITUTE FOR MAGNIFICENT ACHIEVERS, Appellant,

v.

DISTRICT OF COLUMBIA PUBLIC CHARTER SCHOOL BOARD, et al., Appellees.

Nos. 11–CV–710, 11–CV–742.

District of Columbia Court of Appeals.

Argued May 16, 2012.

Decided Nov. 15, 2012.

Gene Schaerr, with whom Charles B. Molster, III, Barry J. Hart, Adam E. Hess, and Ralph V. Pantony, Washington, DC, were on the brief, for appellant.

Micah W.J. Smith, with whom Brian C. Anderson and Courtney B. Dyer, Washington, DC, were on the brief, for appellee District of Columbia Public Charter School Board.

Before OBERLY and BECKWITH, Associate Judges, and STEADMAN, Senior Judge.

STEADMAN, Senior Judge:

The Public Charter School Board ("PCSB") unanimously revoked the charter of the Kamit Institute for Magnificent Achievers ("Kamit") on August 12, 2010. It explained the reasons for taking this action in an extensive accompanying decision statement. Kamit immediately sought judicial review by the Superior Court through a petition for agency review

896

and filed an emergency motion to stay the revocation pending a decision on the review petition. After a series of hearings on the stay motion, the motions court issued a lengthy opinion exhaustively analyzing Kamit's arguments. It concluded that even though there would be significant harm to Kamit if the stay were denied, Kamit had such a low likelihood of success on the merits that it was not entitled to a stay. Our court affirmed the denial on August 27, 2010, noting that the motions court's opinion was "painstaking and thoughtful." Kamit subsequently filed a civil complaint against the PCSB [1] challenging the revocation decision.

Before us now are two consolidated appeals. One is from the decision of the trial court addressing the merits of the agency petition, adopting the motions court's findings and analysis, and affirming the revocation. The other is from the order of the trial court granting PCSB's motion to dismiss Kamit's civil complaint under Super. Ct. Civ. R. 12(b)(6). Once again, we review the PCSB's decision to revoke and conclude, as the statutory standard of review requires, that the decision has not been shown to have been arbitrary and capricious or clearly erroneous and hence must be upheld. Likewise, having made that determination, we affirm the dismissal of the related civil complaint.

## I. Facts

### A. The District of Columbia Public Charter School System

The School Reform Act of 1995 ("SRA") created the District of Columbia public charter school system. In *Richard Milburn Pub. Charter Alt. High Sch. v. Cafritz*, 798 A.2d 531 (D.C.2002), a case also involving a charter revocation, we reviewed at some length the background, purposes, and procedures of the then new system. We noted that "[t]he public charter schools were seen as a vehicle for increasing educational options for the District's students and parents by providing a more diverse mix of educational programs; testing innovative teaching approaches; promoting community and parent involvement in public education; and dispensing with regulatory and bureaucratic obstacles." *Id.* at 533–34. The SRA "allows the charter schools to operate without being subject to the District's education laws and regulations" and, notably, to receive public funding "comparable to that received by the traditional public schools within the system." *Id.* at 534.

A system involving public funding necessarily required oversight. Initially, such responsibility was held by both the District of Columbia Board of Education ("BOE") and the newly created PCSB. The BOE relinquished its chartering and oversight authority in 2007 and eighteen BOE-authorized schools, including Kamit, were transferred to the PCSB's oversight. *See* D.C.Code § 38–1802.01(f).[2]

By statute, the principal oversight obligations of the PCSB are three-fold and broadly worded: first, to "monitor the operations of each public charter school," second, to "ensure that each such school complies with applicable laws and the provisions of the charter granted to such school," and third, to "monitor the progress of each such school in meeting student academic achievement expectations specified in the charter granted to such school."

1. The PCSB and District of Columbia are both appellees on appeal, but since the District adopts the PCSB's arguments, we refer to them collectively as "the PCSB."

2. All references are to the 2001 edition of the D.C.Code or, where a section has been subsequently amended, to the 2012 supplement.

D.C.Code § 38–1802.11(a)(1).[3] The PCSB is composed of seven members who are appointed by the Mayor with Council approval and are selected to ensure that knowledge of a wide variety of matters of educational and operational policy specifically set forth in the statute is represented on the PCSB. D.C.Code § 38–1802.14(a)(2). PCSB's members and staff must be independent from all charter and public schools. D.C.Code § 38–1802.14(a)(6). Each charter school must submit to the PCSB a detailed annual report of its operations, both educational and financial. D.C.Code § 38–1802.04(c)(11).

Under the statute, the PCSB may revoke a school's charter if the PCSB determines that the school "(1) [c]ommitted a violation of applicable law or a material violation of the conditions, terms, standards, or procedures set forth in the charter, including violations relating to the education of children with disabilities" or "(2) [h]as failed to meet the goals and student academic achievement expectations set forth in the charter." D.C.Code § 38–1802.13(a)(1)–(2).[4] As part of its oversight function, the PCSB is required at least once every five years to review a charter school to determine whether the charter should be revoked. D.C.Code § 38–1802.12(a)(3). The statutory procedures to be followed in a revocation proceeding are set forth in some detail and were sustained by us against a constitutional attack in the

*Richard Milburn* case. 798 A.2d at 549–50. In brief, before a charter may be revoked, the PCSB must provide to the school written notice stating the reasons for the proposed revocation and informing the school of its right to an "informal hearing." D.C.Code § 38–1802.13(c)(1). The final decision of the PCSB must be in writing and state the reasons for the revocation. D.C.Code § 38–1802.13(c)(4).

Over fourteen years, the PCSB has revoked six charters, while an additional ten schools have relinquished their charters as a result of the PCSB placing the school on probationary status or proposing revocation.

## B. The Kamit Institute for Magnificent Achievers

Kamit was a public charter school established in 2000 and approved by the BOE. It served approximately 250 middle school and high school students before its charter was revoked in 2010. In its charter petition,[5] Kamit submitted a Mission and Goals Statement, which provided both Academic and Non–Academic Goals. Among its Academic Goals, Kamit listed the following:

- Students who have attended [Kamit] for two years will acquire proficiency in reading, writing, verbal, and mathematical skills that meet or exceed that expected of students in the District of Columbia.

3. In a 2004 amendment, a fourth obligation was added, requiring the PCSB to ensure that each school complies with the annual reporting mandated by the SRA. D.C.Code § 38–1802.14(a)(1)(D). In addition, the PCSB itself must submit an annual report to the Mayor, the District of Columbia Council, and a number of other entities containing a detailed exposition of its activities. D.C.Code § 38–1802.11(d).

4. In addition, the PCSB must revoke the charter of a school that has engaged in fiscal mismanagement, which is not an issue here. D.C.Code § 38–1802.13(c).

5. Certain named provisions of the charter petition, once approved by a chartering body, become the school's charter, most notably the provisions relating to the school's mission and goals and to the proposed rules and policies for its governance and operation. *See* D.C.Code § 38–1802.03(h)(2).

- Students who have attended [Kamit] for three years will acquire proficiency in reading, writing, and verbal and mathematical skills that will exceed or meet that expected of the Nation's top schools.

 . . .

- [Kamit] will illustrate that inner-city pupils can be educated to attain the level of scholastic performance commonly associated with private college preparatory institutions.

- [Kamit] students will demonstrate improved student standardized test scores that meet or exceed those expectations of schools with the same general characteristics with regard to gender, race, and socio-economic status.

Under its Non–Academic Goals, Kamit asserted that student performance "will be indicated by records of attendance" and that school performance will be demonstrated by having "student, staff, and parent attendance rates that are clearly improved over those of traditional District of Columbia Schools"; "Student, Staff, and Parent accomplishment will be measured by attendance records." Kamit also said it would employ "a governance structure which provides both efficient operation and active involvement of parents, teachers, and members of the community."

In describing how Kamit proposed to accomplish these goals, Kamit stated that "[i]n every classroom, instruction [will be] tailored to the individual needs of the students. To that end, each student will have an Individual Learning Plan [ ("ILP") ]." Kamit's Board of Directors was to govern the school, being specifically responsible for "[t]he general policies of the school, not the day-to-day operations of the school," for "[a]pproving and monitoring the school's annual budget," and for "[a]pprov-

ing the school's personnel policies and monitoring their implementation."

Finally, under the "Accountability and Compliance" section, Kamit stated that its "Accountability for Educational Outcomes" would include providing each student an ILP, having regular audits which include assessments of academic achievement, analyzing teacher and student attendance records, and having "progress towards meeting other objectives as specified in this petition." Based on these assertions by Kamit, the BOE granted Kamit's charter petition.

## C. The PCSB's Revocation Proceedings Against Kamit

By 2010, the PCSB had been overseeing Kamit for three years and issuing annual reports and notices to Kamit concerning its deficiencies—the same deficiencies that would later form the basis of the proposed revocation. Finally, in the tenth year of the school's operation, the PCSB, on June 21, 2010, approved a proposal to revoke Kamit's charter. It followed the SRA statutory procedures by giving notice to Kamit setting forth the reasons for the proposed revocation, which was followed up by further clarification requested by Kamit's counsel. Kamit was granted an informal public hearing to make an oral presentation, with a question and answer session with the PCSB. The PCSB also listened to public comments at the hearing and considered two post-hearing supplements submitted by Kamit. On August 12, 2010, after "having carefully studied the available evidence and [Kamit's] submissions," the PCSB "regretfully [ ] determined that [Kamit's] charter should be revoked." The decision was unanimous. Before us, Kamit challenges this decision on both substantive and procedural grounds.

## II. Analysis

### A. Standard of Review

 By statute, our review of the PCSB's decision must be highly deferential. "A decision by an eligible chartering authority to revoke a charter shall be upheld unless the decision is arbitrary and capricious or clearly erroneous." D.C.Code § 38–1802.13(c)(6)(B). Under this "narrow" standard, the PCSB only has to "examine the relevant data and articulate a satisfactory explanation for its action." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (citation and internal quotation marks omitted). " '[A] court is not to substitute its judgment for that of the agency,' and should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " *Id.* at 513–14, 129 S.Ct. 1800 (citations omitted). In other words, "we are to presume the validity of agency action." *Washington Gas Energy Servs., Inc. v. District of Columbia Pub. Serv. Comm'n,* 924 A.2d 296, 304 n. 9 (D.C.2007).

 This general presumption is even stronger where, as here, the agency was delegated informal decision making authority with the expectation that it would "draw heavily upon its expertise." *Bradford Nat'l Clearing Corp. v. Sec. & Exch. Comm'n,* 191 U.S.App.D.C. 383, 402, 590 F.2d 1085, 1104 (1978). "[I]n reviewing the resulting decisions while not sharing that expertise courts typically accord agency conclusions considerable respect." *Id.* And finally, we deal here with the field of education, in which courts have been particularly reluctant to intrude or second-guess. *See Richard Milburn,* 798 A.2d at 539 (" 'Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint.' " (quoting *Board of Curators of the Univ. of Missouri v. Horowitz,* 435 U.S. 78, 91, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978))); *Marjorie Webster Jr. Coll., Inc. v. Middle States Ass'n of Colleges & Secondary Sch., Inc.,* 139 U.S.App.D.C. 217, 224, 432 F.2d 650, 657 (1970) ("[J]udicial review of appellant's [educational accreditation] standards should accord substantial deference to appellant's judgment regarding the ends that it serves and the means most appropriate to those ends.").

Kamit launches a spirited attack on the PCSB's decision, asserting that "the PCSB's improper and *ultra vires* actions were both arbitrary and capricious and contrary to [the PCSB's] express statutory authority," and that the PCSB was a "rogue agency" acting outside its statutory authority. As we see it, Kamit's arguments can be broken down into two principal categories: 1) the reasons stated by the PCSB for the revocation and their bases failed to fulfill the statutory standards focusing on the charter itself, and 2) even if the PCSB followed the statutory procedural requirements, it was arbitrary and capricious in not following either of two frameworks that it had developed for analyzing prospective revocations.

### B. The Revocation Decision

In coming to its decision to revoke, the PCSB was dealing with an administrative record encompassing some 2,435 pages. The record reflected three years of monitoring and cataloguing Kamit's operation and included the documentation relied on in making the decision to revoke. In its extensive revocation decision statement, the PCSB considered Kamit's persistently poor test scores, Kamit's underdeveloped curriculum, Kamit's administrative failures, and Kamit's governance failures. The PCSB found that "[a]lthough [Kamit] has operated as a public charter school for ten years, and although the PCSB has worked to assist in addressing its short-

comings for the last three years, the school continues to have dismal test results, truancy problems, an underdeveloped curriculum, and severe governance shortcomings." Based on its past three years of review, the PCSB was further "convinced that [Kamit] does not have the capacity adequately to remediate these shortcomings."

As might be expected, the PCSB first examined Kamit's record in improving student performance. It set forth a chart of standardized test scores over the past eight years that demonstrated both the low rankings on reading and math proficiency and the absence of any consistent significant improvement. The PCSB characterized the chart "as indicative of the school's overall deficient performance," which "demonstrates only excessive academic failure." Kamit presented its case to the expert analysis of the PCSB and has provided us with no compelling evidence to counter this assessment of Kamit's record by those knowledgeable in the field.[6] Indeed, Kamit acknowledged to the PCSB that, in one of its best years, the scores still "were not as good as they should have been," while the other years "were equally or more disappointing" and that it took "no pride in our students' performance on the [exams]."

Kamit now makes much of the fact that the PCSB specifically mentioned only the charter provision outlining goals for students who had attended the school for three years, as to which apparently no firm data existed in the record. But the PCSB did not rest its decision to revoke on this provision alone; rather, we think a fair reading of the discussion is that the PCSB was more broadly addressing the overall academic performance of the school in relation to the several stated charter goals[7] in coming to its conclusion, in the words of the statute, that Kamit had failed "to meet the goals and student academic achievement expectations set forth in its charter." In short, we see no basis to characterize as "arbitrary and capricious or clearly erroneous" the PCSB's ultimate judgment that Kamit's "persistently dismal test scores over the course of nearly a decade, with no consistent upward trajectory, are sufficient to warrant revocation of [Kamit's] charter."

The PCSB deemed this conclusion "particularly appropriate because [Kamit's] poor test results appear to be [the] result of pervasive curricular, administrative, and governance failures." The PCSB then proceeded to illustrate these failures, which bore not only on charter compliance but also on the question of the prospects for any future upturn in the ten-year dismal academic performance and the PCSB's conclusion that Kamit did not have the capacity to remedy the school's shortcomings.

Addressing Kamit's "underdeveloped curriculum," the PCSB noted that in petitioning to become a charter school, Kamit had proposed an innovative curriculum that would offer ILPs and "infuse its academic program with Kamitic principles (i.e., Ancient Egyptian principles)," neither

---

6. Kamit argues that its high graduation rate and adequate yearly progress achievements (accomplished through a safe harbor because of consistent fluctuations in Kamit's test scores) demonstrated its students' acceptable proficiencies. However, the PCSB was not unreasonable in concluding that these factors did not outweigh Kamit's decade of persistently poor test scores.

7. Although Kamit asserts that the goals were merely aspirations, the statute specifically treats them as a basis for revocation. D.C.Code § 38–1802.13(a)(2). Even on an absolute scale, the record contains an analysis that shows Kamit ranking consistently near the bottom of all charter schools.

of which had been effectuated in the PCSB's view. The PCSB also observed other failures to implement a "fully developed curriculum," noting insufficient textbooks and other supplies and the absence of any library or an effective biology lab. There is no showing that it was "clearly erroneous" for the PCSB to find that these curriculum issues contributed to the persistently poor test scores.[8]

The PCSB also examined Kamit's administrative and governance failures. The PCSB noted Kamit's past difficulties managing transcripts that took three years to improve upon, but particularly criticized the continuing attendance and truancy problems. Under the PCSB guidelines, attendance rates under 87% were deemed unacceptable. From the 2007–2008 school year to the 2009–2010 school year, Kamit only managed to achieve attendance rates of 78%, 79%, and 80% and truancy rates were 74%, 33%, and 30%. While noting the improvements, the PCSB felt that the deficient track record "shows that [Kamit] does not sufficiently appreciate the correlation between engaged students and student achievement."[9] With respect to governance, the PCSB stated that Kamit's Board of Trustees had failed to comply with the SRA in certain respects. Listing a series of deficiencies, the PCSB concluded that these failures "likely exacerbated the various testing, curriculum, and administrative problems" of the school.

■ While differing views may be taken on details of the evidentiary record, the PCSB is empowered with the expertise and responsibility to make educational judgments. Our examination of the careful exposition by the PCSB of the reasons underlying its revocation decision and the related record leaves us no basis to think that the decision was "arbitrary and capricious or clearly erroneous."[10]

## C. Procedure

Kamit's principal attack on the procedures followed by the PCSB in coming to the revocation decision is that the PCSB did not utilize either of the two supplemental frameworks it had developed for school accountability. It invokes the doctrine

8. Kamit takes umbrage at the PCSB's dictates relating to the proper integration of Kamitic principles. But this was not a single basis for revocation and we see no need to explore whether this constituted excessive interference by the PCSB beyond a charter dictate. More generally, to the extent that certain factors addressed by the PCSB may have gone beyond, strictly speaking, statutory violations, they nonetheless bore relevance in informing the PCSB for exercising its discretion whether to revoke on the established statutory grounds.

9. Kamit states in its brief that for the 2009–2010 school year the attendance rate was 87% with a citation to a chart in the record which supports that number. In any case, if there was an inaccuracy about this number, it does not change our analysis. Nor does Kamit's assertion that the numbers, especially for 2007–2008, were marred by Kamit's faulty collection method.

10. To the extent that one might take issue with the format of the decision statement, the PCSB might be well advised to refer more specifically to the charter provisions that it is addressing in future revocation decisions, as well as the relevant statutory subsection that is being invoked. Its failure to do so in the statement here, however, does not bar affirmance, since the underlying structure of the decision in relation to the charter and the statute can be discerned. *Fox Television Stations, Inc.*, 556 U.S. at 513–14, 129 S.Ct. 1800 ("[A court] should 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'"). While Kamit may take issue as to whether every single one of the multiple criticisms of the school set forth in the PCSB statement could qualify as a basis for revocation, no clear challenge to the authority of the PCSB was articulated at the agency level, and the reasons given, as a whole, justify the action of the PCSB.

that an administrative agency "is required to adhere to its own regulations." *Dankman v. District of Columbia Bd. of Elections & Ethics,* 443 A.2d 507, 513 (D.C. 1981) (en banc). At the time the PCSB assumed oversight responsibility of Kamit in 2007, the PCSB was utilizing the Charter Review Framework ("CRF"). Under the CRF, the PCSB assessed schools according to data collected under their "accountability plans." Starting in 2009, the PCSB began discussing the implementation of a new accountability system, the Performance Management Framework ("PMF").[11]

In its decision statement, the PCSB carefully explained its reasons for not relying on either of these frameworks. The PCSB could not use the CRF in reviewing those schools, like Kamit, which did not fall under PCSB aegis until 2007 because insufficient data existed to utilize the CRF framework. A similar problem existed with respect to the utilization of the new PMF because academic metrics for the 2009–2010 school year were not yet available.

More broadly, the PCSB noted that both frameworks were only general policies and had not been promulgated pursuant to either formal or informal rule-making. Moreover, under both, the PCSB retained its overall authority and discretion to act outside of their provisions where prompt action was warranted. Indeed, the decision statement gives several examples of situations where the PCSB determined, in its expert judgment, that revocation was warranted without using either framework.

Kamit focuses, in particular, on the requirement in both frameworks that a school be given what it terms "charter warnings" before a revocation action takes place. At bottom, Kamit's plea is that, given time, it could do better. But Kamit was in its tenth year of existence, and a review was called for by statute. For three years the school had received input and criticism from the PCSB, detailed in the administrative record. An explicit notice setting forth the proposed grounds for revocation was provided to the school in ample time for the statutory hearing. It should hardly have come as a complete surprise that possible revocation was in immediate prospect.

Unable to use either the CRF or the PMF and harboring what it called "serious concerns regarding student achievement at Kamit and two other schools," the PCSB once again took action directly under the SRA.[12] We conclude that the PCSB has sufficiently explained the basis for this action and that it cannot fairly be deemed "arbitrary and capricious" or in violation of any legal limitation in proceeding as it did.

---

11. Kamit also argues that it was treated differently than similarly situated schools, but has failed to point to any evidence of a BOE-chartered school which lacked a fully functioning accountability plan, but was still reviewed using the CRF or of a school that was reviewed using the PMF on academic issues for the 2009–2010 school year. The PCSB pointed out in its decision statement that no charter school is the same and that it was charged with "exercising its expert judgment in assessing the unique circumstances of any particular school, and reaching a school-specific judgment about whether public funding should continue to be made available." The same considerations apply to any assertion that schools with even poorer academic records survived a revocation review, if indeed any such instances exist.

12. The other two schools voluntarily relinquished their charters. In *Richard Milburn,* we noted the legislature's intent to "provide an expeditious means to close down public charter schools that fail to meet statutory requirements and the terms and conditions of their individual charters." 798 A.2d at 548.

## D. Dismissal of Kamit's Complaint

■■ We turn now to the dismissal of Kamit's civil complaint, which in substance, duplicated the grounds on which Kamit challenged the validity of the revocation order. "We review an order granting a motion to dismiss *de novo.*" *Hillbroom v. PricewaterhouseCoopers LLP*, 17 A.3d 566, 572 (D.C.2011) (citation omitted). "In so doing, we apply the same standard the trial court was required to apply, accepting the allegations in the complaint as true and viewing all facts and drawing all reasonable inferences in favor of the plaintiffs." *Id.* (citation omitted). However, the complaint must contain factual allegations that " 'plausibly give rise to an entitlement to relief.' " *Potomac Dev. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). In addition our review should realistically take into account our affirmation of the revocation decision as set forth above.

■ Kamit's complaint contained six counts. Count I alleged that "the PCSB had no statutory authority to usurp the role of Kamit's Board of Trustees and dictate Kamit's academic standards." Count II alleged that the PCSB did not give fair notice to Kamit before it deprived Kamit of its property (its charter). Count III alleged that the PCSB violated Kamit's due process rights by not providing a meaningful opportunity to be heard. All three allegations relate to issues that we have addressed in this opinion and found to be meritless. There is no warrant for their reconsideration in a separate civil action.

■ Count IV alleged that the PCSB tortiously interfered with Kamit's contract with the BOE. However, pursuant to D.C.Code § 38–1802.01(f), the PCSB became Kamit's authorizing agency in 2007. Therefore, Kamit, at the time of the revocation, did not have a contract with the BOE, but rather had one with the PCSB, so there was not an underlying contractual relationship between Kamit and the BOE with which the PCSB could have tortiously interfered.

Count V sought compensatory damages against the PCSB's members and Count VI requests injunctive relief. As Counts V and VI relied on the unsustainable claims in Counts I–IV, they must also fail. Therefore, because Kamit failed to state any claim upon which relief could be granted, the Superior Court did not err in dismissing the complaint under Rule 12(b)(6).[13]

## III. Conclusion

Educational institutions can be the subject of strong emotional attachments. The distress related to the revocation of Kamit's charter is thoroughly understandable. But in the climate of innovation and experimentation afforded to charter schools, it is almost inevitable that some will fail. The PCSB is vested with the express duty and responsibility to exercise its expert knowledge in making judgments on whether a particular charter should be revoked under the statutory standards enacted by the legislature. Every appearance is that the PCSB conscientiously went about that task here and explained in detail the reasons for its action. We have been presented with no grounds on which we may upset that action as arbitrary and capricious or

---

**13.** Kamit briefly complains that it was not given the opportunity to amend its complaint if it was deemed insufficient. However, no indication is given how such an amendment would change the result. We perceive no clear abuse of discretion. *See Brown v. Dyer*, 489 A.2d 1081, 1084 (D.C.1985).

clearly erroneous. Accordingly, the judgments of the trial court must be and are

*Affirmed.*