*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

### Nos. 11-CV-1622 & 12-CV-1227

THE KAMIT INSTITUTE FOR MAGNIFICENT ACHIEVERS,
APPELLANT,

V.

DISTRICT OF COLUMBIA PUBLIC CHARTER SCHOOL BOARD, ET AL.,
APPELLEES.

Appeals from the Superior Court
of the District of Columbia
(10-CAP-6091)

(Hon. Michael L. Rankin, Trial Judge)

(Argued October 17, 2013                    Decided December 26, 2013)

*Adam E. Hess*, with whom *Gene Schaerr*, *Charles B. Molster III*, *Barry J. Hart*, and *Ralph V. Pantony III* were on the brief, for appellant.

*Courtney B. Dyer* with whom *Brian C. Anderson* was on brief, for appellee District of Columbia Public Charter School Board.

*Holly M. Johnson*, Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General, were on the brief, for appellee District of Columbia.

Before WASHINGTON, *Chief Judge*, and GLICKMAN and THOMPSON, *Associate Judges*.

GLICKMAN, *Associate Judge*: Shortly before the Public Charter School Board ("PCSB") revoked its charter in August 2010, the Kamit Institute for Magnificent Achievers, Public Charter School, Inc. (hereinafter referred to as "Kamit"), received from the District of Columbia a quarterly operating budget appropriation of $703,691 for the upcoming school year. These funds were placed in an escrow account while Kamit challenged its charter revocation in Superior Court. With the PCSB's approval, some of the escrowed funds were disbursed to Kamit to cover operating expenses it incurred notwithstanding that its charter school was closed. However, the PCSB refused to release the remaining balance in escrow, $165,936.33, to reimburse Kamit for severance payments it had made to its departing faculty and staff. The Superior Court declined to overrule the PCSB's decision and ordered that the funds remaining in the escrow account be returned to the District of Columbia. Kamit, still claiming entitlement to those funds, has appealed the court's rulings denying its request for reimbursement. We conclude, however, that because Kamit's charter has been revoked and the PCSB is charged by law with liquidating its assets, settling its debts and conveying any surplus to the District, Kamit has no legally cognizable interest in the funds at issue and lacks standing to maintain this appeal.

**I.**

Kamit was formed in 1999 as a District of Columbia nonprofit corporation with the purpose, according to its articles of incorporation, of securing a charter to operate a public charter school pursuant to the School Reform Act of 1995.[1]  The Board of Education granted Kamit a charter in June 2000.  Ten years later, however, on June 21, 2010, the PCSB initiated proceedings to revoke Kamit's charter.[2]  These administrative proceedings culminated in the PCSB's revocation of Kamit's charter on August 12, 2010.  Kamit immediately filed a petition in Superior Court for judicial review of the PCSB's decision, along with an emergency motion to stay the revocation.  The stay was denied, and after further proceedings, the Superior Court upheld the decision to revoke Kamit's charter in May 2011.  This court affirmed that ruling in *Kamit I*.[3]

---

[1]  Now codified, as amended, at D.C. Code § 38-1802.01 *et seq.* (2012 Repl.).  An entity must be organized as a nonprofit corporation in order to be granted a charter to operate a public charter school.  *Id.* § 38-1802.04 (c)(16).

[2]  *See id.* §§ 38-1802.01 (f), -1802.13.

[3]  *See Kamit Institute for Magnificent Achievers v. District of Columbia Public Charter School Board* (*Kamit I*), 55 A.3d 894, 903 (D.C. 2012).

The revocation of Kamit's charter is now final. The present appeal concerns an ancillary dispute having its genesis in events that occurred in July 2010 while the revocation proceedings were under way before the PCSB. First, on July 13, Kamit's board of trustees met and approved a severance package for all eligible faculty and staff as an incentive for them not to leave the school while it was still seeking to retain its charter. The board agreed that these employees would receive the equivalent of one month of salary for each year they had worked at Kamit; that employees who had been with the school for over one year would receive the cash equivalent of six months of healthcare benefits (and those employed for less than a year would receive the cash equivalent of one month of healthcare benefits); and that all eligible employees would be compensated for their accrued and unused vacation and sick leave and for their pension allocations. This severance package was outlined to members of the faculty and staff at a meeting on July 14. Kamit subsequently executed written severance agreements with its employees after its motion to stay the revocation of its charter was denied. Under these agreements Kamit eventually paid $361,253.90 in severance and associated payroll taxes.

Second, on July 15, 2010, Kamit received its initial quarterly operating budget appropriation payment from the District government for the 2010-11 school year. The amount of this payment, $703,691, was based on Kamit's projected

student enrollment for the school year in accordance with a uniform per student funding formula.[4] After the PCSB revoked Kamit's charter, the District moved to intervene in the ensuing Superior Court proceedings "in order," it explained, "to protect its interest, and that of its citizens, in the $703,691 in public funds that the District disbursed." The motion to intervene was granted. The District then filed a third-party complaint against Kamit and a motion seeking the immediate return of the July 15 operating budget appropriation payment on the ground that Kamit, lacking a charter, would not be schooling any children in the 2010-2011 school year. Kamit opposed this relief on the grounds that it had incurred some reimbursable operating expenses in preparation for starting the school year and would be unable to pay its legitimate creditors if the relief were granted.

On September 20, 2010, the parties agreed to deposit the $703,691 in an escrow account from which Kamit could receive disbursements for eligible expenses pursuant to the terms of an escrow order entered by the court. The order

---

[4] *See* D.C. Code §§ 38-2902, -2906, -2906.02 (2012 Repl.). Section 2906.02 (h) now provides that when a public charter school's charter is pending revocation, the Office of the State Superintendent of Education shall hold the July 15 payment in escrow, and that "[u]pon a final revocation decision, the Mayor shall have no obligation to release the escrow funds." However, this provision, added to the statute in 2011 by D.C. Law 19-21, § 4032, was not in effect when Kamit's charter was revoked. *See* 58 D.C. Reg. 6226 (July 29, 2011), 8470 (Oct. 7, 2011).

required Kamit and the PCSB to "meet and confer in good faith with respect to any expenses of [Kamit] that should be paid from the escrowed funds." In the event the PCSB did not consent to a requested disbursement, the order provided that, on Kamit's motion, the Superior Court would "rule on the propriety of the expenses."

Following the entry of this order, the PCSB agreed to release funds from the escrow account to reimburse Kamit for a number of expenses, including rent and utilities for the facility that Kamit leased from the District through November 2010 and the salaries of employees who remained on the payroll through the first week of December for wind-down purposes. These approved disbursements reduced the balance in the escrow account to $165,936.33. Kamit requested the PCSB to release these remaining funds to it as (partial) reimbursement for the severance payments it had made to its former employees. The PCSB, taking the position that the severance payments were not operating expenses incurred in preparation for the 2010-11 school year, refused Kamit's request. Kamit thereupon moved in Superior Court for disbursement of the funds pursuant to the dispute resolution provision in the escrow order.

On December 2, 2011, the court denied Kamit's motion, finding that "Kamit has not offered any reason for the court to view this escrow account as the

designated source of funding for its severance contracts." In recognition of the PCSB's "authority to oversee settling of debts, liquidation of assets, and the return to the [Office of the State Superintendent of Education] of remaining assets" following the revocation of a public charter school's charter, the court decided to "leave[] it to PCSB whether Kamit should be recompensed for its generosity to its employees." The District then moved for the return of the remaining balance in the escrow account. The court granted that motion and ordered the funds to be released to the District. Kamit timely appealed both of the court's rulings.

## II.

In this court, Kamit contends that the Superior Court erred by not ruling on the "propriety" of its severance expenses. Instead of deferring to the judgment of the PCSB, Kamit argues, the court should have deferred under the business judgment rule to the decision by Kamit's board of trustees to enter into the severance agreements.[5] The District and the PCSB disagree with Kamit's

---

[5] Under the business judgment rule,

> directors' decisions will be respected by courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or

*(continued…)*

arguments on the merits. As a threshold matter, however, they argue that Kamit has no standing to maintain this appeal. We agree with appellees on this point and do not reach any other issues.[6]

At a minimum, for Kamit to establish standing to obtain the relief it seeks, it must demonstrate that the denial of reimbursement for its severance payments from the escrowed funds caused it to suffer an "injury in fact" that may be "redressed by

_____

*(continued…)*

> reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available.

*Behradrezaee v. Dashtara*, 910 A.2d 349, 361 (D.C. 2006).

[6] Appellees first challenged Kamit's standing in a motion to dismiss the appeal, which a motions panel of this court denied in a one-page order. That denial was without prejudice, however, to our reconsideration of the issue of standing. *See In re J.A.P.*, 749 A.2d 715, 717 (D.C. 2000) ("[E]ven when a motions division of this court has allowed the appeal to proceed, . . . the division assigned to decide the merits is not bound by that order if, after briefing and consideration, it concludes that the standards governing appeal under the statute are not satisfied."); *Kleinbart v. United States*, 604 A.2d 861, 867 (D.C. 1992) ("[W]hen a motions division denies a motion to dismiss . . . , such denials shall be deemed to be without prejudice to reconsideration by a Merits Division unless expressly denied with prejudice." (internal quotation marks omitted)). We exercise our discretion to reconsider Kamit's standing because "we do not believe that the issue was thoroughly aired and definitively resolved" at the motions stage. *Id.*

a favorable decision."[7]  To demonstrate an injury in fact, Kamit must show "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."[8]  Moreover, it is not enough that Kamit may have had standing to seek reimbursement from the escrowed funds at the outset of this litigation, or even when it noted its appeals of the Superior Court's rulings.  The requisites of standing must continue to be met as long as the appeals continue.[9]  As we shall see, because the revocation of Kamit's charter has become final, Kamit by law has lost any interest it may have had in the escrowed funds, or in being reimbursed, and so it now cannot satisfy the requirements of standing.

---

[7] *Grayson v. AT&T Corp.*, 15 A.3d 219, 246 (D.C. 2011) (internal quotation marks omitted).

[8] *Id.* (internal quotation marks omitted).

[9] *See United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980) (defining mootness as "the doctrine of standing set in a time frame," in that "[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."); *Mallof v. D.C. Bd. of Elections & Ethics*, 1 A.3d 383, 395 n.54 (D.C. 2010) ("Standing is determined at the time the complaint is filed, while mootness ensures that the requisite personal stake necessary at the outset of litigation continues through its course.") (internal quotation marks omitted).

Public charter schools in the District of Columbia are governed by the provisions of the School Reform Act (the "SRA") codified at D.C. Code § 38-1802.01 *et seq.*[10] Among those provisions is § 38-1802.13a, entitled "Mandatory dissolution." This section was added to the SRA by D.C. Law 16-268, the Public Charter School Assets and Facilities Preservation Amendment Act of 2006. It became effective on March 14, 2007.[11] It provides that a nonprofit corporation operating a charter school "shall dissolve" if the charter has been revoked,[12] and that upon revocation, the chartering authority (i.e., the PCSB[13]), "in consultation with" the charter school's board of trustees, "shall develop and execute a plan for" liquidating the corporation's assets, discharging the corporation's debts, and distributing any remaining assets "to the District of Columbia, to be controlled by the Office of Education Facilities and Partnerships within the State Education

---

[10] *See Kamit I*, 55 A.3d at 896; *Richard Milburn Pub. Charter Alternative High Sch. v. Cafritz*, 798 A.2d 531, 534 (D.C. 2002).

[11] D.C. Law 16-268, 54 D.C. Reg. 833 (Dec, 28, 2006).

[12] D.C. Code § 38-1802.13a (a)(1) (2012 Repl.).

[13] Although Kamit received its charter in 2000 from the Board of Education, the Board's powers and duties as chartering authority were transferred to the PCSB in 2007. *See id.* § 38-1802.01 (f).

Office and used solely for educational purposes."[14]  For these purposes, the board of trustees is required, "[a]s soon as feasible," to submit a "closeout audit" to the PCSB.[15]

According to the Committee Report on the bill that added § 38-1802.13a to the SRA in 2007, its purpose was "to ensure that public funds invested in charter schools are returned to the public for continued use in support of education needs when a charter school ceases to operate as a charter school."[16]  Prior to 2007 this had been a problem, the Committee Report explained, because a nonprofit corporation organized and empowered by statute to operate a charter school could remain in existence after the school closed, with "no purpose and no powers," and without "any explicit guidance for the disposition of [the] corporation, its liabilities

---

[14]  D.C. Code § 38-1802.13a (d)(1), (2)(A).  The statute further provides that the plan of liquidation and distribution of assets must comport with the terms of existing creditor agreements and applicable laws, and that "creditors shall retain all rights, powers, and remedies available to them to cure default as defined in their agreements with the charter school." *Id.* § 38-1802.13a (d)(2)(B).

[15]  *Id.* § 38-1802.13a (d)(3).

[16]  Council of the District of Columbia, Committee on Education, Libraries, and Recreation, Report on Bill 16-624, the "Public Charter School Assets and Facilities Preservation Amendment Act of 2006," at 1 (Nov. 28, 2006) [hereinafter "Committee Report"].

or its assets."[17] As a result of this "lack of clarity," the Board of Education and the PCSB "ha[d] experienced difficulties when closing charter schools and ha[d] expressed a need for specific legislation to provide clarity on the process to be followed in such circumstances."[18] Section 38-1802.13a addressed this perceived need by providing that a nonprofit corporation organized to operate a charter school "must be dissolved" after the school closes, and by specifying the procedures to be followed for "protecting the investment of public dollars in these schools."[19]

Although the foregoing requirements of § 38-1802.13a took effect in 2007, they apply to pre-existing charter schools such as Kamit. This is made explicit in subsection (c) of the statute. The first paragraph of subsection (c) requires nonprofit corporations operating public charter schools to acknowledge in their

---

[17] *Id.* at 6.

[18] *Id.* As an example of the need for the proposed bill, the Committee Report cited a public charter school that had received millions of dollars in public funds during the five years it was in operation. "After surrendering the school's charter . . . , the Board of Trustees . . . proceeded to sell the facility on the open market and earned considerable profits on this transaction. Even though the facility and its operation were constructed and maintained almost exclusively with public funds, the proceeds from this investment were not available to the District for continued use in support of educational needs." *Id.*

[19] *Id.* at 6-7.

articles of incorporation or bylaws that they will dissolve and return their remaining assets to the State Education Office of the District of Columbia if their charters are revoked.[20] The second paragraph of subsection (c) grants a temporary exemption from the requirement of the first paragraph; it states that "[a] nonprofit corporation with an existing charter as of March 14, 2007, shall not be required to amend its articles of incorporation or bylaws to comply with the requirements of this section until the time of its charter renewal under § 38-1802.12."[21] The third paragraph of subsection (c) states that "[n]othing in this subsection shall be construed as exempting the corporation from any other requirements of this section."[22] Thus, while a pre-existing charter school such as Kamit is not required to amend its articles of incorporation or bylaws until its charter comes up for renewal, it is subject to all the other requirements of § 38-1802.13a.

---

[20] *Id.* § 38-1802.13a (c)(1).

[21] *Id.* § 38-1802.13a (c)(2). Subsection (a) of § 38-1802.12 ("Charter renewal") provides that "[a] charter granted to a public charter school shall remain in force for a 15-year period" and "may be renewed for an unlimited number of times, each time for a 15-year period."

[22] *Id.* § 38-1802.13a (c)(3).

In its brief, Kamit suggests that § 38-1802.13a cannot be applied to it without violating the Contract Clause of the United States Constitution,[23] but it has articulated no argument in support of that claim.  In particular, Kamit has identified no obligation of the contract granting its charter (or of any other contract) that is impaired by § 38-1802.13a.[24]  We therefore consider Kamit to have waived any claim of a Contract Clause violation.[25]

Consequently, now that the revocation of Kamit's charter is no longer subject to legal challenge, Kamit must relinquish all control over its assets and cease its existence.  The power to liquidate Kamit's assets, discharge its debts, and

---

[23]  U.S. CONST. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ."), made applicable to the District of Columbia by D.C. Code § 1-203.02 (2012 Repl.) (a provision of the District of Columbia Home Rule Act).

[24]  *See also Exxon Corp. v. Eagerton*, 462 U.S. 176, 190 (1983) ("The Contract Clause does not deprive the States of their broad power to adopt general regulatory measures . . . .  One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them.  The contract will carry with it the infirmity of the subject matter.") (internal quotation marks and citation omitted).

[25]  "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008) (internal quotation marks omitted).

distribute any remaining funds is vested solely in the PCSB (though the PCSB must "consult with" Kamit's board of trustees). Kamit has no residual interest in any surplus; by law it all goes to the District.[26] Kamit thus has no "legally protected interest" in the escrowed funds at issue in this appeal—it cannot benefit by obtaining those funds, since the PCSB would dispose of them in any event, and it suffers no injury by being deprived of them. In other words, Kamit has nothing to gain by pursuing this appeal. It therefore lacks standing to do so, and the appeal must be dismissed.

*So ordered.*

---

[26] In its response to appellees' motion to dismiss its appeal, Kamit argued that it retains an interest in funds it received from private (as opposed to public) sources. It is not clear why this should be so; the mandatory dissolution provisions of the SRA do not distinguish between privately and publicly contributed funds and leave it to the PCSB to determine whether any private donations must be returned to the donors or redirected because the school closed. However, because (as Kamit's counsel acknowledged at oral argument) there is no evidence in the record that Kamit actually possesses any segregated, privately contributed funds, any potential issue presented by the existence of such funds is not before us.